Filed 5/31/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S076999 |
| v. | ) | |
| | ) | |
| MATTHEW A. SOUZA, | ) | |
| | ) | Alameda County |
| Defendant and Appellant. | ) | Super. Ct. No. 122159B |
| _____ | ) | |

A jury convicted defendant Matthew A. Souza of the first degree murders of Regina Watchman, Dewayne Arnold, and Leslie K. Trudell (Pen. Code, § 187), and the attempted premeditated murders of Rodney James and Beulah John (Pen. Code, §§ 187, 664).[1]  An allegation of multiple-murder special circumstance (§ 190.2, subd. (a)(3)) was found true, and defendant was found to have personally used a deadly weapon (an automatic rifle) in the commission of the murder. (§ 12022.5.)  Following the penalty phase of the trial, the jury returned a verdict of death against defendant.  The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)), and imposed a sentence of death, with additional consecutive terms of 25 years to life in prison on each of the three murder convictions plus 10 years for the firearm use, and concurrent life terms on both attempted murder convictions, all of which were ordered stayed pending

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

imposition of the judgment of death.  Defendant's appeal is automatic.  (§ 1239, subd. (b).)  We strike and modify the restitution orders; as so modified, we affirm the judgment.

## I.  FACTS

### A.  Introduction

In retaliation for an earlier incident in which their mother had been forcibly removed from a house party, defendant Matthew Souza, his brother Michael, and a third, unidentified man[2] armed themselves with guns and drove to the apartment of murder victim Regina Watchman.  At the party they opened fire on the partygoers; five people were shot, and three of the victims died.

The prosecution sought the death penalty against both brothers but only defendant's case proceeded to the penalty phase because the jury did not find the special circumstance true as to codefendant Michael Souza.[3]

### B.  Guilt Phase

#### 1.  *The prosecution's evidence*

In December 1993, defendant, who was 18 years of age, and Michael, who was 19 years of age, were staying with their mother Rebecca Souza, in a room in Rebecca's cousin's apartment in Oakland, where Rebecca was living.   Defendant

---

[2]    The third man was never apprehended, remains unidentified, and played no role in these proceedings.

[3]    The jury found Michael Souza guilty of the counts charged against him, found that the murders were of the first degree, and found true the allegation that he was armed with a firearm in the commission of the murders.  It did not return a true finding on the special circumstance allegation.  Michael Souza was sentenced to a single term of 25 years to life in prison, plus four years for use of a firearm, with the terms on the remaining convictions to run concurrently.  To avoid confusion, we hereafter refer to Michael Souza as "Michael."

and Michael did not have a permanent residence, and were dividing their time between relatives, family friends, and their mother's room in the Oakland apartment.

One evening in mid-December, Rebecca, who like all of the victims is Native American, attended a fundraiser at the Hilltop Tavern in Oakland, a popular gathering place for Native Americans. Rebecca, who attended the fundraiser with friends, began drinking alcoholic beverages before arriving at the tavern, and drank between five and 10 more beers while at the tavern, becoming noticeably intoxicated. At some point in the evening, victim Regina Watchman approached Hilary Leonesio and told her that she believed Rebecca was flirting with Leonesio's boyfriend, and that Leonesio should do something about it. When Leonesio confronted Rebecca, Rebecca stated that nothing had occurred, and Leonesio did not pursue the matter further. After the tavern closed, 10 to 15 people, including Rebecca, were invited to Regina Watchman's apartment for an "after party." Rebecca did not know Watchman. Before leaving the bar, Rebecca searched for her purse, but could not locate it. Rebecca apparently had forgotten that she had placed her purse in the trunk of her friend Esther Dale's car for safekeeping.

Watchman's boyfriend Raymond Douglas was at the apartment that evening with Watchman's mother and four young children. When the guests arrived from the Hilltop Tavern at approximately 2:00 a.m. on December 19, 1993, Douglas began drinking with them. He testified that upon arrival, many of the guests appeared to be heavily intoxicated. He also testified that more alcohol was served at the apartment and some members of the group became "pretty drunk."

At some point in the evening, Watchman forcibly removed Rebecca from the party. Numerous witnesses observed the altercation. Edward Arnold was a

3

designated driver that evening, and did not consume any alcohol. He testified that he saw Watchman come down the stairway and ask if anyone wanted anything to drink. Rebecca asked who Watchman was, and Watchman responded that "This is my house." Rebecca asked several more times whose house it was, and who Watchman was. Arnold believed from witnessing the interaction that Rebecca was attempting to provoke Watchman. Eventually, Watchman stated "This is my house, and I want you to leave." Rebecca refused to do so, and instead continued to ask whose house it was, and who Watchman was. Eventually, Arnold observed as Watchman grabbed Rebecca by the hair and pulled her about 10 feet to the door. Rebecca was stepping along as Watchman pulled, and Arnold did not observe any hitting or kicking. Hilary Leonesio, Raymond Douglas, Lea Coss, and Martin Jones also witnessed the altercation, and testified similarly to Arnold. None of the witnesses reported seeing any punching or kicking by Watchman, and no one observed any visible injuries or blood on Rebecca. Edward Arnold drove Rebecca home after the altercation, along with Esther Dale and Jeri Davis. The drive to Rebecca's home lasted 20 to 25 minutes. Arnold testified that during the duration of the trip, Rebecca repeatedly stated that she was going to "get even" with "those people." Arnold told Rebecca to calm down, get some sleep, and forget about it. Rebecca responded, "these people aren't going to get away with this. They're going to get — they will pay for this and I'm going to get even with them." Dale testified that on the ride home from the party, Rebecca cried "a little bit." Rebecca also stated that her head was hurting. Dale did not observe any blood or injuries on Rebecca. Thirty minutes after Rebecca was forced to leave the party, Jeri Davis called and asked Leonesio to look for Rebecca's purse and coat. Leonesio looked for the items, but could not find them.

Rebecca Souza testified that she was intoxicated at the party, and that she argued with Watchman, who told her to leave. She remembered being struck in

4

the back of the head and being knocked down. Thereafter, she lay on her back as Watchman kicked her in the ribs and called her a "whore," and then dragged her along the floor by her hair. She testified that no one else was involved in the altercation, and she believed Watchman was angry with her because of the incident earlier in the evening when Leonesio believed Rebecca was flirting with Leonesio's boyfriend.

At trial, Rebecca could not recall what she said in the car on the way home from the party. Her testimony at the preliminary hearing was admitted into evidence, however, and at that hearing she stated that during the drive home, she had said she "wasn't going to put up" with being thrown out of Watchman's party, claiming "[s]he can't do this to me, who does she think she is," and that she was going to tell her sons. Upon arriving at the apartment, Rebecca was crying, in physical pain, and upset. On direct examination, she testified that she was in a state of shock and may have been "hysterical." Rebecca stated that upon arriving home, she noticed that she was bleeding from the mouth, although she was unsure how she had received the injury. She testified that there was blood on the front of her shirt, which she attempted to clean. After Rebecca changed into a clean shirt, her cousin attempted to clean the stain to no avail, after which Rebecca threw away the shirt. Rebecca did not tell the police about her shirt or her injury, and the cousin did not testify.

Sometime after she arrived home, defendant and his brother awoke, and Rebecca convinced them to take her back to the party. At the preliminary hearing, Rebecca testified that her reason for going back to the party was to "get even with [Watchman]," and that she wanted to "hit [Watchman] on the nose or something." She further testified that she did not show her sons her injury, and "I don't think they knew anything about the injury."

5

However, at trial, contrary to her preliminary hearing testimony, Rebecca testified that she wanted to return to the party to retrieve her purse, jacket, and identification, having realized her purse was missing sometime after returning home. Rebecca did not mention the missing purse or identification to police, but testified that she told her sons she wanted to return to the party to retrieve her belongings. Upon cross-examination, Rebecca stated that she had "probably" told her sons that she was beaten up, and "probably" showed them the cut on her mouth. She further testified that she told her sons she was assaulted by one woman, not a group of people, and that she may have told them that the woman who assaulted her was also the woman who told her to leave the party.

Rebecca and her sons left the apartment and drove around looking for the party, but could not find it. Although Michael stored a .22-caliber rifle at the apartment, they did not take the rifle with them. During the drive, Rebecca calmed down and stopped crying. When they could not find the party, Rebecca, defendant and Michael drove back to the Hilltop Tavern to look for Dale's car because Rebecca thought she might have left her purse and jacket in Dale's car. They then drove to Jeri Davis's house, but Davis was not home. Thereafter, defendant and Michael took Rebecca home, leaving the apartment again after she went to sleep.

About an hour after Rebecca and the others left the party, Leonesio stepped outside to check on her boyfriend, who was asleep in a car. As she unsuccessfully attempted to wake her boyfriend, Leonesio observed a car pull up behind them. She observed what she believed were three people in the vehicle, and it appeared to Leonesio that the occupants of the car were waiting to see what she would do. The occupants of the car watched Leonesio as she walked back to the apartment. Leonesio watched the vehicle, whose engine was still running, from the front gate, and saw a man run to the apartment. Leonesio entered the apartment to tell the

6

others what she had observed, but three men with guns came into the room.**4** Leonesio later identified the first man to enter the apartment as Michael, and testified that she focused on him when the three men entered. The three men appeared to be Native American or Hispanic.

Numerous witnesses testified regarding the shootings. Martin Jones testified that approximately one hour after Rebecca left the party, a man later identified as defendant, a man later identified as Michael, and a third man entered the apartment. Michael displayed a shotgun that had been hidden under his jacket, pointed it at Jones's chest and asked, "who jumped my mother?" Jones was experienced with firearms in general, and shotguns in particular, and identified Michael's weapon as a sawed-off 12-gauge pump-action Mossberg shotgun with a pistol grip. Similarly, Raymond Douglas saw a man, whom he later identified as Michael, enter the apartment, pull a shotgun from underneath his jacket, and aim it at Douglas. Douglas was familiar with firearms, and was certain Michael carried a shotgun.

Jones testified that after Michael advanced into the room, forcing Jones backward, two additional men entered the apartment. One of the men was armed with an assault rifle with a magazine that extended three or four inches below the receiver. The third man was armed with a nickel-plated .25-caliber semiautomatic handgun. Both men wore bandannas that covered their mouths and chins. Jones testified that defendant was "definitely" one of the armed men who followed Michael into the apartment. Douglas also identified defendant as one of the men who entered the apartment after Michael. According to Douglas, defendant was

---

**4** The downstairs level of Watchman's apartment was one large room with an open kitchen, a laundry area, and stairs leading to the upper level, where the bedrooms were located.

armed with a large gun, or possibly a large handgun. The third man was armed with a revolver. Douglas was not certain precisely where defendant positioned himself after entering the apartment, only that it was somewhere near the stairs.

Joyce Gonzales also saw the men waving the guns in front of them and heard Michael repeating, "Who did this to my mom?" or "Who did this to our mom?" Gonzales stepped in front of the men and said, "What are you doing?" and "Your mom's our friend," or "Your mom's my friend."[5] Similarly, Douglas heard Michael ask, "Which one of you motherfuckers beat up my mom?" Joyce Coss saw Michael standing in the middle of the room shouting, "who kicked my mother's ass, just show me who did it. Show me which one is the bitch that kicked my mother's ass and stole her purse." Jones testified that the man holding the assault rifle stood at the bottom of the stairs leading to the upper level of the apartment, holding the assault rifle to his face, and aiming it into the room. The man with the handgun stood at the front door, aiming his weapon into the room with both hands. Leonesio's testimony placed the three men in the same positions.

Michael stopped directly in front of a couch in the middle of the room, facing away from the front door. Victims Dewayne Arnold and Regina Watchman were sitting together on the couch. Michael asked where his mother's purse was. Douglas testified that Michael walked over to the couch, pointed the shotgun

---

**5** Gonzales testified that "a second" after she spoke to the men, they left the apartment. Gonzales had not taken her eyes off the three men while they were within her line of vision, and only after they left did she look around and see the bodies all around her. Gonzales could not recall seeing or hearing any shooting and believed that the shooting happened when she was upstairs or when she was coming down the stairs, and was over by the time she encountered the three men. She acknowledged, however, that she may have witnessed the shooting but had subsequently "blocked" it from her mind, an issue she was still working through with her therapist at the time of trial.

directly at Watchman, and asked, "Who's the bitch that beat up my mom?" Jones testified that when Michael positioned himself in front of the couch, Dewayne Arnold attempted to stand up, and asked, "what the hell is going on here?" Michael struck Arnold on the head with the butt of the shotgun, but Arnold ducked and avoided the full force of the blow. As Michael attempted to strike Arnold again, Arnold reached for him. Jones testified that Arnold reached for Michael, not for his shotgun. Douglas heard Arnold say, "We don't need any trouble." Douglas and Coss also saw Michael strike Arnold as he attempted to stand up, then heard a lamp break followed by scuffling. Arnold again attempted to stand, and Michael struck him again, causing him to fall back to the floor. Arnold may have reached for Michael's gun when he fell to the floor the second time, but he did not grab the gun. Coss testified that as Arnold fell to the floor a second time, a lamp, or possibly Michael's gun, broke and fell to the floor.

As Michael prepared to strike Arnold a second time, Jones saw the man with the assault rifle step forward and point the weapon at Arnold. Because Jones believed the man with the assault rifle was preparing to fire, Jones hid behind the refrigerator. As he reached the refrigerator, Jones heard 15 or more gunshots, lasting 10 to 15 seconds. In his estimation, the gunshots were not fired quickly enough to have come from a fully automatic weapon, but rather sounded like they came from a semiautomatic weapon. One of the gunshots was not as loud as the others. Jones emerged from behind the refrigerator after the shooting stopped, and he heard footsteps and the sound of an automobile driving away.

Douglas dropped to the floor when he heard gunfire. He did not see who did the shooting. Before he dropped to the floor, Douglas saw, out of the corner of his eye, a muzzle flash either in the center of the room, or somewhere on that side of the room. Douglas did not observe where defendant was standing after the lamp broke, and did not see whether defendant walked toward Michael after first

9

positioning himself near the stairs. After hearing five or six gunshots, Douglas saw legs running out the door.

After witnessing Michael's assault on Arnold, Coss left the apartment through a sliding glass door leading into the backyard. As she rose, she heard the first of "a lot" of gunshots, but could not see who was shooting or where the shooting was coming from. Although at the preliminary hearing she testified that she saw a flash from a gunshot fired from the middle of the room, at trial she could not remember where the flash had come from, but she stated she heard a shot from the middle of the room.

As Arnold attempted to rise from the floor, Leonesio heard gunfire, and saw a flash of light from Michael's gun discharge toward Arnold. Leonesio ran onto the patio with Coss, and heard more gunfire. Although she initially testified that the gunfire lasted for 20 to 30 seconds and was continuous, she later stated that there were pauses between groups of shots, but all of the shots appeared to be coming from the same gun. She heard bursts, followed by pauses, followed by bursts, and there were several such bursts and pauses.

After the three men left the apartment, Jones observed Trudell lying near the refrigerator with a pool of blood around his head. He appeared to be dead. Dewayne Arnold too was lying on the ground in a large pool of blood, and also appeared to be dead. Watchman was on the couch, with her eyes open and blood patterns on her chest. Jones observed her exhale but she did not inhale again. Victim James was sitting in a chair by the front door and had been shot in the shoulder. He was breathing very heavily and appeared to be in shock. Joyce Gonzales also observed the aftermath of the shooting, and testified that she saw her best friend Beulah John in the kitchen, lying in a pool of blood. John was shot in the leg, just below the hip. The other witnesses corroborated Jones's and

10

Gonzales's recollections of the crime scene and the locations of the victims. The police arrived five to 10 minutes after the shootings.

Page Nelson was Watchman's neighbor. Nelson was awake at 5:00 a.m. and heard extremely loud gunfire. When Nelson looked out the window, he saw a car drive away approximately one minute after the shooting stopped, seeing it clearly when it drove under a street light. Nelson believed the car depicted in exhibit No. 24, photo No. 8, which was a photograph of Michael's car, looked very similar to the car he saw.

Later that day, police found Michael's car parked in Oakland. They kept the car under surveillance, but when people began loitering around the car, the police impounded it. Inside the trunk, police found three shotgun shells.

Officer Monica Russo, an evidence technician working for the Oakland Police Department, processed the physical evidence at Watchman's apartment. Russo found 14 rifle casings spread around the room in "almost a complete 360." Although some furniture in the apartment had been moved by emergency personnel, Russo found casings in locations where it was unlikely they had been disturbed by emergency workers, such as in a basket on top of a table, on top of the kitchen counter, and on top of a blue patio-type chair. Russo found two bullet holes in the apartment walls, but neither bullet was recovered. Russo found five major pools of blood on the floor, and one .25-caliber pistol casing, and two slugs or bullets of unspecified caliber. She found no evidence that a shotgun had been fired in the room.

Lansing Lee, an Oakland Police Department criminalist, analyzed the ballistics evidence. He determined that all 14 of the .223-caliber casings recovered from the apartment were fired by the same rifle. One of the slugs recovered from the apartment was .25 caliber and one was .223 caliber. One slug removed from Watchman, four bullets removed from Arnold, and one of the

11

fragments removed from Trudell were .223 caliber. Of the six .223-caliber bullets he was provided, Lee could determine that five were fired from the same weapon. According to Lee, one fragment recovered from Trudell and one recovered from Watchman were also "likely" fired from that weapon. The remaining fragments were too small to identify or compare. Lee testified that none of the fragments appeared to have come from a shotgun.

Lee testified that .223-caliber rifles can be automatic or semiautomatic. An automatic weapon is capable of firing more than one round with each trigger pull, while a semiautomatic weapon fires only one round with each trigger pull. The number of automatic weapons available to the public is "very limited" and assault rifles are only semiautomatic. The maximum capacity of assault rifle magazines ranges from five to 50 or more rounds.

Dr. Sharon Van Meter, a board-certified pathologist, conducted the autopsies of the three murder victims and testified regarding her findings. Watchman was shot three times, and bled to death from the gunshot wounds — dying within three to 20 minutes. She did not necessarily lose consciousness before dying. A mark around one of the bullet holes on Watchman's clothing indicated that one shot had been fired from a distance of approximately two feet. Watchman's blood-alcohol level was 0.12 percent. Dewayne Arnold was shot seven times, and died within one or two minutes from these wounds. Arnold's blood-alcohol level was 0.54 percent, and testing revealed a "fairly high level" of methamphetamine in his system. Trudell was shot twice, and died within a few heartbeats. The marks surrounding the wounds indicated to Van Meter that Trudell was shot from a distance of greater than three feet. Van Meter found no evidence that a shotgun was fired at the scene.

Evidence was presented regarding a photographic lineup conducted on December 21, 1993, two days subsequent to the shooting. Witnesses Douglas,

12

Jones, and Coss were shown a lineup that contained photographs of defendant and Michael. All of the witnesses identified Michael as the first armed man to enter the apartment. None of the witnesses identified defendant's photograph as one of the armed men who entered the apartment with Michael. But at the physical lineup conducted on December 28, 1993, Douglas and Coss identified defendant as the second armed man to enter the apartment.

### 2. *The defense evidence*

In his defense, defendant re-called Officer Russo, the evidence technician, who described in further detail the locations of the shell casings and bullet holes she found in Watchman's apartment. Lansing Lee, criminalist from the Oakland Police Department, also was re-called to the stand, and testified that a shotgun slug could create a single bullet hole, but he found no evidence that a shotgun slug had been fired in the present case. He further testified that a .223-caliber rifle ejects spent shell casings to the right, sometimes as far as 30 feet, and the casings could ricochet. Lee further explained that if a .223-caliber rifle is fired from a single position, the casings would not be spread widely throughout the room.

Defendant presented the testimony of Officer Thomas Swisher of the Oakland Police Department, who testified regarding the investigation of the case. Swisher, who was the primary investigator, interviewed the witnesses to the shooting, and soon learned of the altercation between Watchman and Rebecca Souza. Thereafter, he learned the names of her sons, defendant and Michael. Using this information, he created the photographic lineup. For defendant and Michael, he used photographs obtained from the Department of Motor Vehicles (DMV). For the remainder of the photographs, he requested that the police photography lab make the photos appear to look like DMV photographs. Swisher was aware that some of the witnesses were Native American, but he was not aware

13

of the ethnicities of any of the people depicted in the photographs used in the lineup, choosing photographs based solely upon the physical similarly between the men depicted and the photographs he had of defendant and Michael. Swisher oversaw the search for defendant and Michael, which included conversations between Swisher and the Souza family. Defendant and Michael surrendered on December 27, 1993, and the physical lineup was held one day later.

## C. Penalty Phase

### 1. *The prosecution's evidence*

Leslie Miller, a tribal chairman and a relative of victims Watchman and Arnold, testified regarding their good nature. Miller emphasized that Watchman had four young children who were sleeping upstairs when the shooting started. Two of the children were under the age of three, and although one of the older children seemed to be coping with Watchman's death, the other older child remained deeply disturbed, and was not adjusting well.

Dewayne Arnold's daughter Angel testified that her father's murder left her and her three siblings fatherless. She was 18 years of age at the time of her father's murder, and her youngest sibling was 11 years of age. She testified that her father was a good man, and her family was deeply affected by his death.

Joyce Arnold, Dewayne Arnold's sister, testified that she continued to receive therapy at the time of trial, five years after the shooting. She had made efforts to forget the shooting, but was unable to do so, continuing to have traumatic flashbacks.

Trudell's sister Patricia Gordon testified that her brother was a Vietnam Veteran who initially had great difficulty readjusting to civilian life. Eventually, he found personal satisfaction in teaching children, and devoted much of his time and energy to a nonprofit organization called Indian Youth of America. Gordon

14

explained that Trudell also engaged in a great deal of other volunteer work with children.

### 2. *The defense evidence*

Defendant presented the testimony of numerous witnesses, who testified regarding his good character, his gentle nature, his difficulties in school, and his close relationship with Michael.

Defendant's father Harry Souza, Jr., testified that defendant was one of four children, and that defendant and his siblings had a close relationship and never fought. Defendant's grandparents and other relatives played an active role in the children's lives. When defendant was six years old, he was diagnosed with a hearing problem and a learning disability, for which he received treatment, but which caused him to be held back one year in school. Defendant was very good at drawing and mathematics. Defendant and Michael were particularly close, and as the older sibling, Michael was the leader. Defendant's parents divorced when he was 13 years of age. Rebecca Souza initially retained custody, and disappeared with the children for one year. When Harry Souza located the children, it was decided they should live with him temporarily. However, after approximately one week, Rebecca Souza told Harry she did not want the children, and they should continue living with him, a circumstance that greatly upset defendant and his siblings. Harry never received reports of misbehavior from defendant's school, and testified that defendant was a very shy, caring child who had never been in a fight.

Defendant's other brother Mark Souza described defendant as a happy, affectionate child. Mark also had a close relationship with defendant. Mark never knew defendant to be violent or aggressive, and described him as the animal lover in the family. Mark owned several guns, which he and his brothers would shoot

15

on camping trips, and occasionally on a shooting range or on back roads. Mark testified that defendant was an "okay" shot. Defendant helped Mark, who was the assistant manager of the Shattuck Apartments, with his work responsibilities, and was one of the better employees Mark ever had.

Defendant's sister Marcie Souza described defendant as a shy, artistic child who was very close to his older brother Michael, who was the leader. He was never violent with her or with anyone else, and she had never known defendant to have a girlfriend because he was too shy.

David Bard was the manager of the Shattuck Apartments, where defendant lived for some years, and where defendant's grandmother had worked for 32 years before she died. Bard described the Souza family as close and loving, and defendant as well-behaved, polite, and respectful. Bard never saw any indication that defendant was involved with gangs, or abused alcohol or drugs.

Lee Williams was a friend of defendant's father, and babysat defendant and Michael when they were children. He testified that defendant was a well-behaved, happy, and affectionate child. He described defendant as a talented artist, and warm and engaging, but very shy. He never saw defendant engage in violent or aggressive behavior, and described Rebecca Souza as a good parent. Williams rarely saw the Souza children after defendant's parents divorced.

Harry Souza's friend, neighbor and employer Gary Nichols testified that defendant was a well-behaved child and that all of the Souza children were very close to and protective of their mother. Cathleen Thomas, who lived with the Souzas briefly during defendant's childhood, testified that defendant was a happy, well-behaved child who was a "little bit" shy.

Ruth Underwood knew the Souza family throughout defendant's childhood. She testified that defendant was shy, more likely than the others to stay in the background, and that she never saw defendant in a fight. She recounted that after

the divorce, Rebecca Souza began drinking excessively, and that during this period, defendant and his siblings were not attending school. Defendant's uncle Randy Souza testified that during the time defendant's parents were married, he observed Rebecca intoxicated in front of the children. Rebecca often became violent and belligerent while drinking.

Five of defendant's teachers testified regarding his performance in school, and his status as a special education student. They uniformly described defendant as well-behaved, and a hard worker, but noted that his attendance in school was sometimes sporadic. In elementary school, defendant was calm, shy, and respectful. Defendant had a learning disability that affected his ability to read and write, but he was a strong performer in mathematics and was good at problem solving. Defendant's high school special education coordinator described defendant's intelligence and his grades as higher than average. Defendant's high school mathematics teacher described him as a good student with a positive attitude toward learning. Defendant was quiet, diligent, and shy.

Defendant's aunt testified that defendant and his siblings were very well-behaved, and had a loving relationship with their grandparents. Defendant appeared to be protective of his mother. Three members of the Eaves family, with whom the Souza family lived briefly when defendant was 11 years of age, testified that defendant and his siblings were extremely well-mannered, well-behaved children, and that Rebecca Souza was a good cook and homemaker. Jerry Eaves, with whom Harry Souza played music, testified that defendant was particularly kind to animals, and was very close with and considerate towards his grandparents.

The educational coordinators of the adult school district that included the Santa Rita jail testified that defendant was a diligent and dedicated student during his incarceration, and was working toward fulfilling the requirements for a regular

17

high school diploma at the time of trial. They testified that after moving to another jail from the Santa Rita jail, defendant had been mailing in his school assignments.

## II. DISCUSSION

### A. Asserted Errors Affecting the Guilt Phase of Trial

#### 1. *Denial of defendant's severance motion*

Defendant contends the trial court erred in denying his pretrial motion for severance, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. For the reasons outlined below, we conclude that the trial court did not err.

##### (a) Facts

Before trial, defendant moved to sever his trial from that of codefendant Michael. Defendant contended that a joint trial would be unfair because the uncertain state of the evidence made it likely that the codefendants would present antagonistic defenses. Specifically, defendant asserted that because the evidence as to the identity of the actual shooter was disputed — some witnesses' testimony indicated that Michael was the individual who fired the fatal shots using the shotgun, but the physical evidence suggested that the shots were fired from a semiautomatic rifle rather than a shotgun — each codefendant was likely to defend by asserting that it was the other who fired the fatal shots. As defendant observes, the identity of the person who fired the fatal shots was crucial to establishing the truth of the special circumstance finding of multiple murder, and that circumstance also could be used as an aggravating factor in the penalty phase of the trial. (See §§ 190.2, subd. (a)(3), 190.3, subd. (j), and 190.2, subd. (c) [in order for an aider and abettor to be eligible for the death penalty for any non-felony-murder special

18

circumstance, the prosecution must establish intent to kill].)  Defendant also contended that severance was required in light of incriminating out-of-court statements Michael had made that the prosecution might offer into evidence at trial.  Defendant made a concurrent motion in limine to exclude Michael's out-of-court statements.

The trial court granted defendant's motion to exclude Michael's out-of-court statements but denied the motion to sever the trials.  Upon appointment of a different trial judge, the court revisited the motion to sever the trials, although counsel declined the opportunity to orally argue their positions.  The trial court again denied the motion, noting that a defendant's natural tendency is to shift blame to a codefendant, but that such blame shifting is not sufficient grounds for severance.

### *(b) Discussion*

Our Legislature has expressed a strong preference for joint trials.  (*People v. Burney* (2009) 47 Cal.4th 203*,* 236 (*Burney*); *People v. Lewis* (2008) 43 Cal.4th 415, 452 (*Lewis*); *People v. Boyde* (1988) 46 Cal.3d 212, 231, 250; cf. *People v. Soper* (2009) 45 Cal.4th 759, 771-772 [expressing judicial preference for joinder in context of joined charges].)  "Section 1098 provides in pertinent part:  'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.'  The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses." (*Lewis, supra,* at p. 452, citing *People v. Avila* (2006) 38 Cal.4th 491, 574-575 (*Avila I*); see also *People v. Massie* (1967) 66 Cal.2d 899, 917.)  "Additionally, severance may be called for when 'there is a serious risk that a joint trial would

19

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*Lewis, supra,* at p. 452, quoting *Zafiro v. United States* (1993) 506 U.S. 534, 539 [addressing severance under Fed. Rules Crim.Proc., rule 14, 18 U.S.C.]; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*).)

"We review a trial court's denial of a severance motion for abuse of discretion based upon the facts as they appeared when the court ruled on the motion." (*Burney, supra,* 47 Cal.4th at p. 237; see also *Lewis, supra,* 43 Cal.4th at p. 453; *People v. Hardy* (1992) 2 Cal.4th 86, 167 (*Hardy*).) "If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable the defendant would have obtained a more favorable result at a separate trial." (*Burney, supra,* at p. 237; see also *Lewis, supra,* at p. 453; *Coffman, supra*, 34 Cal.4th at p. 41; *People v. Keenan* (1988) 46 Cal.3d 478, 503 (*Keenan*).) "If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " (*Lewis, supra,* at p. 452, quoting *People v. Mendoza* (2000) 24 Cal.4th 130, 162; see also *People v. Soper, supra,* 45 Cal.4th at p. 783 [" 'if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law.' "].)

We conclude the trial court did not abuse its discretion in denying defendant's motion for severance in the present case. As in *Burney* and *Lewis,* defendant and codefendant Michael were charged with having committed " ' "common crimes involving common events and victims." ' " (*Burney, supra,* 47 Cal.4th at p. 237; accord, *Lewis, supra,* 43 Cal.4th at pp. 452-453, quoting *Keenan, supra*, 46 Cal.3d at p. 500.) Thus, as in our prior cases, the trial court was

presented with a " 'classic case' " for a joint trial. (*Burney, supra,* at p. 238; see also *Lewis, supra,* at p. 453; *Avila I, supra*, 38 Cal.4th at p. 575; *Coffman, supra*, 34 Cal.4th at p. 40; *Keenan, supra*, at pp. 499-500.)

Nevertheless, defendant contends he was prejudiced by the denial of the severance motion because the defense presented by his codefendant — that defendant, not Michael, fired the fatal shots — was antagonistic to his defense that it was Michael, not defendant, who shot the victims for purposes of the multiple-murder special-circumstance allegation.**6** Defendant asserts that the evidence presented at the joint trial did not establish beyond a reasonable doubt that *either* Michael *or* defendant fired the fatal shots. Moreover, because Michael's counsel argued the evidence showed that defendant, not Michael, fired the fatal shots, defendant contends that his own defense was precluded. Defendant claims, therefore, that if the jury believed that Michael's defense theory was correct and Michael *was not* the shooter, then it would have no choice but to conclude that defendant *was* the actual shooter, regardless of whether the evidence established this fact beyond a reasonable doubt.

Defendant's contention is meritless. "The court's discretion in ruling on a severance motion is guided by the nonexclusive factors enumerated in [*Massie, supra,* 66 Cal.2d at p. 917], such that severance may be appropriate 'in the face of an incriminating confession, prejudicial association with codefendants, likely

---

**6** The sole special circumstance allegation was multiple murder, section 190.2, subdivision (a)(3). As the jurors were instructed, a finding of guilt of two murders, at least one of which is first degree murder, conclusively establishes the truth of the special circumstance for the actual killer and renders him eligible for death. (§ 190.2, subd. (a)(3).) As to the aider and abettor who did not actually kill the victims, however, the special circumstance requires an additional finding that he harbored an intent to kill. (§ 190.2, subd. (c).)

confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Coffman, supra,* 34 Cal.4th at p. 40.) Nevertheless, "[i]f the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' " (*Hardy, supra,* 2 Cal.4th at p. 168, quoting *People v. Turner* (1984) 37 Cal.3d 302, 312-313.)

"Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.]" (*Hardy, supra*, 2 Cal.4th at p. 168.) " 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " (*Ibid.*, quoting *United States v. Davis* (1st Cir. 1980) 623 F.2d 188, 194-195.) If "there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*Coffman, supra*, 34 Cal.4th at p. 41.)

In the present case, it was undisputed that all of the victims were shot with a rifle, and that the rifle was wielded by only one shooter. Witnesses identified both brothers as being present and armed with guns.[7] The eyewitness testimony, however, conflicted with the physical evidence as to which brother fired the fatal

---

[7]     Defendant concedes that although his counsel fleetingly suggested that there was reasonable doubt he was at the crime scene at all, it was undisputed that if he was there, he was the second gunman. Because neither the evidence nor the parties suggested that the third, unidentified gunman was the shooter, the critical factual determination for the jury was whether the first gunman, Michael, or the second gunman, defendant, fired the fatal shots.

shots.  Most notably, Leonesio testified that she saw gunfire come from Michael's gun toward Dewayne Arnold.  Coss saw a flash from a gun, and although she testified at trial that she could not identify where it came from, at the preliminary hearing she testified that it came from Michael's position.  Douglas similarly testified that he saw a flash and a shot from Michael's position in the room.  Witnesses Jones and Douglas — who were both familiar with firearms and closely observed the gunmen — testified that Michael was armed with a shotgun.  Jones further testified that the second gunman, identified by others as defendant, carried a rifle.  Thus, although no witnesses testified that defendant carried a shotgun or that Michael carried a rifle, no witnesses testified that defendant actually *shot* the rifle.

Conversely, the physical evidence established conclusively that all of the victims were shot with a rifle, and not with a shotgun.

Nevertheless, despite the conflicting nature of the eyewitness testimony and the physical evidence, and the circumstance that defendant and his codefendant relied upon antagonistic versions of the evidence presented, defendant does not establish that the conflict *alone* demonstrated his guilt.  The prosecution presented independent evidence supporting defendant's participation in the events that night, and although the evidence that he fired the fatal shots was circumstantial, the fact that Michael's defense depended in part upon naming defendant as the actual murderer was not dispositive.  The evidence merely conflicted as to whether Michael discharged his weapon but there was no irreconcilable conflict as to who fired the fatal shots.  Notably, none of the surviving witnesses directly saw how each victim was shot.  The forensic evidence conclusively supported the prosecution's contention that the victims were shot with a rifle, and the eyewitnesses placed that rifle in defendant's hands.  As to the victim Arnold, the jury could have reasonably inferred from Martin Jones's testimony that, when

23

Michael scuffled with Arnold at the couch, defendant was the man armed with the rifle who stepped forward and shot Arnold.

In conclusion, joinder was proper in the present case. The charges against defendant and Michael were identical, and both defendants were charged with capital crimes. There was no danger of jury confusion, or prejudicial association. Neither defendant nor Michael testified at trial, and there also was no suggestion that if tried separately, Michael would have provided testimony exonerating defendant. Moreover, because the trial court granted defendant's motion to exclude Michael's out-of-court statements, there was no issue concerning extrajudicial statements in which a codefendant implicated defendant. Finally, no evidence was presented at the joint trial that would not have been presented at a separate trial.

Under these circumstances, no gross unfairness resulted from the joint trial. (*Lewis, supra,* 43 Cal.4th at p. 461; see also *Avila I, supra*, 38 Cal.4th at pp. 574-576; *Coffman, supra*, 34 Cal.4th at p. 41; *People v. Box* (2000) 23 Cal.4th 1153, 1195-1197.)

### 2. *Alleged failure to instruct on lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter*

Defendant contends that the trial court's failure to instruct on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter in a heat of passion at the guilt phase of his trial violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. Defendant asserts there was sufficient evidence of provocation and sudden heat of passion to support the instructions with regard to all five victims. We reject that contention.

24

Counsel for defendant and his codefendant requested instructions on the lesser included offense of voluntary manslaughter committed in a reasonable heat of passion with regard to victims Watchman, Arnold, and Trudell, and the offense of attempted voluntary manslaughter committed in a reasonable heat of passion with regard to victims John and James. The trial court, agreeing with the prosecutor that reasonable heat of passion requires provocation from the victim, declined to give voluntary manslaughter instructions except on the count relating to victim Watchman, the only victim who assaulted Rebecca Souza. Defense counsel conceded that voluntary manslaughter instructions were proper only as to Watchman.

Defendant's counsel also sought instructions on unpremeditated second degree murder with regard to victims Arnold and Trudell, and on the relevance of provocation evidence to the element of premeditation for all five victims. The trial court granted these requests, agreeing with defendant that provocation — while not adequate to reduce murder to voluntary manslaughter with regard to any victim except Watchman — nevertheless could be relevant with regard to premeditation and deliberation. Accordingly, the trial court provided the standard CALJIC instructions concerning second degree murder (CALJIC Nos. 8.30, 8.31, 8.71, 8.73, 8.74), and on the relevance of provocation evidence in determining the degree of murder (CALJIC No. 8.73). The instructions were not limited to any particular count, but rather applied broadly to all charged offenses.

In light of the trial court's ruling regarding these instructions, defense counsel withdrew his request for an instruction on voluntary manslaughter in the heat of passion with regard to victim Watchman. As he explained to the trial court, the withdrawal of his request for this instruction was a tactical decision to prevent unnecessary jury confusion resulting from different instructions related to the word "provocation."

25

Defendant now contends that despite defense counsel's express tactical withdrawal of the request for the instruction on voluntary manslaughter in the heat of passion with regard to Watchman, the trial court nevertheless should have provided the instruction.  He also asserts that substantial evidence existed that the shooting of all five victims was committed in a reasonable heat of passion and that, accordingly, the trial court erred by refusing to instruct concerning the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter with regard to the other four victims.

On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.  (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 739.)  As explained below, there was no substantial evidence that defendant acted under the influence of a reasonable heat of passion invoked by the victims' conduct, and accordingly, the trial court did not err in refusing the requested instructions.

### *(a) Regina Watchman*

Defendant contends that the evidence of both provocation and heat of passion was sufficient to warrant instructions on voluntary manslaughter in the heat of passion with respect to the shooting of Regina Watchman.  As explained *ante*, however, the instruction was not given to the jury because defense counsel voluntarily withdrew his request for it.  Defendant nevertheless asserts the trial court erred in failing to give an instruction on voluntary manslaughter because a " ' "defendant has a constitutional right to have the jury determine every material issue presented by the evidence . . . ." [Citations.]' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007, quoting *People v. Lewis* (2001) 25 Cal.4th 610, 645.)

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues

raised by the evidence. . . ." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*), citing *People v. Mosher* (1969) 1 Cal.3d 379, 393.)

Nevertheless, the claim may be waived under the doctrine of invited error if trial counsel both " 'intentionally caused the trial court to err' " and clearly did so for tactical reasons. (*Coffman, supra,* 34 Cal.4th at p. 49.) Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction. (*People v. Cooper* (1991) 53 Cal.3d 771, 830; *People v. Wickersham* (1982) 32 Cal.3d 307, 332, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

The Attorney General contends the doctrine applies here because defense counsel expressly withdrew his request for the instruction, and explained that his decision to do so was a tactical decision.**8** (See *People v. Wader* (1993) 5 Cal.4th 610, 657-658.) But given that defense counsel's choice appears to have been the product of the trial court's earlier ruling, it may be questionable to impose this procedural bar if counsel merely acted defensively and reasonably in direct

---

**8** Although the trial court was willing to provide the instruction, trial counsel explained that he was withdrawing the request because "I don't want to confuse the jury with the different provocations that may be involved with respect to reducing first to second . . . . Any time the word provocation is used, I don't want it to be confused with provocation that is required for manslaughter, which is one of my tactical reasons in asking that these instructions not be given."

response to the court's earlier ruling that voluntary manslaughter instructions were applicable only as to victim Watchman. (See *People v. Turner* (1990) 50 Cal.3d 668, 704, fn. 18 [counsel's "defensive acts" in light of a court ruling "do not waive an objection on appeal"].)

In any event, no substantial evidence supported a manslaughter instruction as to victim Watchman. During defendant Michael's and Rebecca's first unsuccessful attempt to locate Watchman's home, Rebecca calmed down and defendant and codefendant brought her back home. After Rebecca went to bed, defendant and codefendant armed themselves and set out yet again to find Watchman's home, and, in doing so, they enlisted a third armed accomplice. When they located Watchman's home, they waited outside and observed. Before entering the home, they obscured their faces with bandanas. These circumstances reveal a concerted effort to plan and execute a surprise attack at Watchman's home. "If anything, defendant appears to have acted out of a *passion for revenge*, which will not serve to reduce murder to manslaughter. Although the defense evidence was probative of whether defendant *subjectively* killed in the heat of passion, from an objective standpoint, the evidence arguably did not establish the requisite provocation necessary for conviction of voluntary manslaughter, rather than murder." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144, original italics.)

### *(b) Other victims*

Defendant contends the trial court erred in refusing to instruct the jury on voluntary manslaughter in the heat of passion concerning the counts involving victims Arnold and Trudell, and in refusing to instruct on attempted voluntary manslaughter concerning the counts involving victims John and James. These claims also are meritless.

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744; see also *Breverman, supra* 19 Cal.4th at p. 154 [duty to instruct on court's own motion]; *People v. Flannel* (1979) 25 Cal.3d 668, 684 [duty to instruct on request].) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*Blair, supra,* at p. 745, citing *People v. Memro* (1995) 11 Cal.4th 786, 871; see also *Breverman, supra,* at p. 154.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial — that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Blair, supra,* at p. 745; see *Breverman, supra,* at p. 162.)

" 'Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction." ' [Citation.] This substantial evidence requirement is not satisfied by ' " *any* evidence . . . no matter how weak," ' but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' [Citation.] 'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila II*).)

" 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' [Citation.] 'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' " (*Avila II, supra*, 46 Cal.4th at p. 705.) "The ' "heat of passion must be such a passion as

29

would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . .” ’ [Citation.]” (*Ibid*.) “ ‘The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.’ [Citation.] ‘[T]he victim must taunt the defendant or otherwise initiate the provocation.’ ” (*Ibid*.)

Defendant contends that, even if their passion had cooled by the time the armed men entered the apartment, victim Arnold’s resistance “rekindled” their heat of passion and provided sufficient provocation to justify an instruction on voluntary manslaughter. Specifically, numerous witnesses testified that after Michael stepped in front of Arnold and Watchman — who were sitting side by side on the couch — Arnold rose and demanded to know what was going on. After Michael forced him back down with his shotgun, Arnold attempted to rise again, and according to witnesses Jones and Coss, Arnold reached for Michael. During the scuffle, a lamp was broken. Defendant contends that these acts of defiance and the commotion caused by the lamp breaking, when considered in conjunction with defendant and Michael’s belief that numerous people had assaulted their mother and the emotional state of mind this belief instilled in them, constituted sufficient evidence of provocation to require the giving of the requested instruction.

Even assuming defendant and his brother reasonably believed that a group of persons had assaulted their mother, there was no substantial evidence of “rekindled” provocation or heat of passion because, as explained above, the amount of time that had elapsed between the allegedly provocative act and the crimes made defendant’s actions consistent with planned revenge and such a desire for revenge cannot objectively satisfy the provocation requirement. (*People v. Moye* (2009) 47 Cal.4th 537, 550; *People v. Gonzales* (2011) 52 Cal.4th 254,

301.)  Additionally, Arnold's actions, in standing up from the couch and reaching for Michael — one of three armed unknown men bursting into the home — constituted predictable and reasonable conduct by a victim resisting felonious assault, and not provocation sufficient to merit a manslaughter instruction. (*People v. Pride* (1992) 3 Cal.4th 195, 250; *People v. Rich* (1988) 45 Cal.3d 1036, 1112.)  Thus, defendant's request for such instructions was properly denied.

Nor, contrary to defendant's assertion, was the jury forced into an "all-or-nothing" choice between murder and acquittal after the court refused to instruct on voluntary manslaughter and attempted voluntary manslaughter.  (*See Beck v. Alabama* (1980) 447 U.S. 625, 637; *People v. Benavides* (2005) 35 Cal.4th 69, 103.)  "[N]o fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely."  (*People v. Holloway* (2004) 33 Cal.4th 96, 141.)  Moreover, the jury was instructed on second degree murder and attempted second degree murder, and accordingly had a choice in evaluating defendant's culpability.  (*Schad v. Arizona* (1991) 501 U.S. 624, 646-648 [second degree murder instruction sufficient to ensure verdict's reliability]; *Benavides, supra*, 35 Cal.4th at p. 103.)

> 3. *Asserted error from cumulative effect of failing to instruct on heat of passion and provocation*

As noted above, the trial court instructed the jury on the lesser included offense of second degree murder and further instructed that it could consider any evidence of provocation to determine whether the shooter premeditated and deliberated all of the killings and attempted killings.  In addition to the second degree murder instruction, the court provided a modified version of CALJIC No. 8.73, which informed the jurors, "[i]f the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being,

31

you should consider the provocation for such bearing as it may have on whether a defendant killed with or without premeditation and deliberation." The trial court also instructed the jury pursuant to CALJIC No. 8.20, which defines premeditation as material to first and second degree murder.

Defendant contends that these and related instructions were incomplete because they did not define or explain the terms "heat of passion" or "provocation" and did not explain the relationship between the two terms and their dual relationship to the element of premeditation. He asserts that by refusing the instructions on voluntary manslaughter in the heat of passion in their entirety rather than tailoring them, the instructions that *were* provided to the jury were rendered inadequate because they failed to explain the critical legal principles underlying defendant's defense. He avers this is especially so in light of the prosecutor's numerous asserted misstatements of the law. Therefore, defendant argues, the trial court had a duty to instruct on voluntary manslaughter.

"We apply an independent or de novo standard of review to the failure by a trial court to instruct on the meaning of provocation and heat of passion." (*People v. Cole* (2004) 33 Cal.4th 1158, 1217.) We previously have rejected the contention that CALJIC No. 8.73, a "pinpoint" instruction, is ambiguous. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778-779.) If the evidence in a case does not support instructions on voluntary manslaughter, the definition of provocation and heat of passion as relevant to voluntary manslaughter are immaterial. (*Cole, supra*, 33 Cal.4th at p. 1217.) In such cases, provocation and heat of passion as used in the instructions on second degree murder and in CALJIC No. 8.83 bear their common meaning, which requires "no further explanation in the absence of a specific request." (*Cole, supra,* at pp. 1217-1218; see also *People v. Cox* (2003) 30 Cal.4th 916, 967.) Thus, in the present case, because the instructions as given were complete and because defendant did not ask the trial court to clarify or

32

amplify them, defendant may not complain on appeal that the instructions were ambiguous or incomplete. (*Mayfield, supra*, at p. 779.)

We also reject defendant's contention that the prosecutor's alleged misstatements of the law misled the jury and distorted the meaning of the proffered instructions, thereby rendering otherwise proper instructions inadequate. Defendant asserts that during closing argument, the prosecutor incorrectly told jurors that the central question was whether provocation (not heat of passion) "prevented the person provoked from forming the intent to kill as a process of premeditation and deliberation" and that there must be "provocation that reduces the crime from a willful premeditated murder to a second degree murder." Although the prosecutor's statements were inartful, the jury properly was instructed regarding the role provocation played as material to first and second degree murder and that both concepts — provocation and heat of passion — possessed their ordinary meanings. The prosecutor's argument did not alter meaning of the terms or render the instructions inadequate.

Moreover, contrary to defendant's contention, the prosecutor did not argue to the jury that the relevant inquiry with regard to provocation was what actually happened to Rebecca when she was removed from the party; rather, the prosecutor focused on defendant's subjective state of mind, and argued that the evidence did not establish what Rebecca told her sons upon returning home. The prosecutor also repeatedly reminded the jury that there were no provocative acts by any of the victims except Watchman — a characterization that finds ample support in the record. Similarly, the prosecutor did not improperly object to a defense argument that defendant and his brother believed that more than one person at the party assaulted their mother. The prosecutor's objection was founded upon his conclusion that no evidence supported that theory of the case and did not constitute inappropriate comment on the evidence.

Moreover, the prosecutor, by emphasizing that Arnold's conduct in standing up from the couch and reaching for Michael after Michael pushed him down with his shotgun was reasonable under the circumstances, did not mislead the jury into believing the shooter's state of mind was irrelevant. This comment on the evidence was consistent with the well-established rule that a victim's predictable resistance to a felonious assault does not constitute sufficient provocation to arouse a heat of passion in an ordinarily reasonable person. (*Rich, supra,* 45 Cal.3d at p. 1112.) Finally, the prosecutor's statement that the assault on Rebecca was unlikely to have caused heat of passion sufficient to interfere with deliberation and premeditation did not mislead the jury into believing that the shooter's state of mind was irrelevant, but rather properly conveyed that the existence of any heat of passion depends, in part, upon the events that defendant asserts provoked that passion.

### 4. *Asserted error concerning instruction regarding specific intent for attempted murder*

Defendant contends the trial court's pinpoint instruction on transferred intent for the murder charges improperly conveyed to the jury that it could find defendant guilty of attempted murder without finding that he intended to kill the attempted murder victims, thereby violating state law and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. We reject the contention.

As to the murder charges, the trial court instructed the jury pursuant to CALJIC No. 8.20, the standard deliberate and premeditated murder instruction, and at the request of the prosecutor, added a one-sentence pinpoint instruction providing that "[i]t is not necessary that premeditation and deliberation be directed at a specific individual, it may be directed at a group." Also, the court instructed the jury on the attempted murder charges pursuant to CALJIC No. 8.66 and on the willful, deliberate, and premeditated enhancement allegation pursuant to CALJIC

No. 8.67. The attempted murder instruction did not contain the pinpoint instruction.

Under the common law doctrine of transferred intent, "a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*People v. Bland* (2002) 28 Cal.4th 313, 323-324.) The doctrine does not apply to attempted murder. "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*Id*. at p. 328.)

Defendant contends that the inclusion of the pinpoint instruction on deliberate and premeditated murder made it reasonably likely that the jurors misunderstood the instructions to permit convictions on the attempted murder charges without finding that the shooter had the specific intent to kill victims John and James. Because the instructions did not delineate the difference between the specific intent required for the murder charges and that required for the attempted murder charges, defendant asserts that confusion was likely because the instructions spoke of an intent to "kill a human being" rather than an intent to kill "the person injured" and because Michael's trial counsel conceded that defendants were guilty of at least second degree murder with regard to all three murder victims — even those shot unintentionally.[9]

Defendant did not object to or request amplification of the instructions provided and accordingly his claim that they were inadequate and misleading is forfeited on appeal. (*People v. Welch* (1999) 20 Cal.4th 701, 757.)

---

[9] Michael's counsel argued to the jury that the shooter shot victim Arnold intentionally (but with provocation in the heat of passion), but that the shooter did not intend to kill victims Watchman and Trudell, who were struck accidentally by an inexperienced shooter who did not have control over his automatic weapon.

The claim also fails on the merits. The trial court's instructions were neither erroneous nor confusing, and in light of Michael's counsel's contention that only victim Arnold was killed intentionally, the pinpoint instruction on transferred intent was warranted as material to the murder charges. Moreover, it is not reasonably likely that the jury applied the transferred intent instruction to the attempted murder counts. The attempted murder instruction did not contain the pinpoint language regarding the doctrine of transferred intent, and no language in that or any other instruction suggested that it incorporated definitions from other crimes. To the contrary, the jury was instructed with CALJIC No. 3.31, which provided, as relevant here, that "[t]he specific intent required is included in the definitions of the crimes charged and the lesser included offenses." Additionally, the jury was instructed pursuant to CALJIC No. 17.02 that "[e]ach count charges a distinct crime. You must decide each count separately. Each defendant may be found guilty or not guilty of any or all of the crimes charged." Thus, the jury properly was instructed on each separate crime, and instructed that each crime charged had a separate definition of specific intent. Under these circumstances, there was no likelihood of confusion, and the trial court did not err.

5. *Asserted error from instruction pursuant to CALJIC No. 17.4.1*

Defendant contends his rights under the Sixth and Fourteenth Amendment to the federal Constitution were violated by instruction pursuant to CALJIC No. 17.41.1. The instruction, as it was read to the jury, provided: "The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation."

36

Although defendant correctly observes that we held in *People v. Engelman* (2002) 28 Cal.4th 436 that CALJIC No. 17.41.1 should not be given in criminal trials in California because it has the potential to intrude unnecessarily on the deliberative process and affect it adversely, defendant points to nothing in his trial that would provide a compelling reason for us to reconsider our further conclusion that giving the instruction, although ill-advised, does not violate a defendant's constitutional rights. (*Engelman, supra,* at p. 454.)

### 6. Asserted error based on the prosecutor's reference to assertedly false evidence

Defendant contends the prosecutor misled the jury on numerous occasions — during both the guilt and penalty phases of his trial — by referring to "false" evidence during argument, thereby violating defendant's right to due process and requiring reversal of the guilt and penalty phase verdicts. As the Attorney General correctly characterizes it, the claim is one of prosecutorial misconduct, and defendant failed to object to the conduct below and has, therefore, forfeited these claims on appeal. (*People v. Gray* (2005) 37 Cal.4th 168, 215.) In his reply brief, defendant withdraws these claims, except as it may accumulate prejudice as to other asserted errors. But the only other identifiable error that bears relevance to this claim of prosecutorial misconduct is instructional error at the penalty phase discussed below. As we explain, any asserted prosecutorial misconduct at the penalty phase could not have prejudiced defendant in light of that instructional error. (See *post*, at pp. 54-58.)

## B. Asserted Errors Affecting the Penalty Phase of Trial

### 1. Jury Selection Issues

#### (a) Asserted error based on exclusion of prospective jurors who disfavor the death penalty

Defendant contends the trial court erred in excluding for cause four prospective jurors who expressed reservations about the death penalty, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution.

A prospective juror in a capital case may be excluded for cause if his or her views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) Prospective jurors "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Id.* at p. 425.) Accordingly, "deference must be paid to the trial judge who sees and hears the juror" and must determine whether the "prospective juror would be unable to faithfully and impartially apply the law." (*Id.* at p. 26.) We apply this standard to determine whether excusing a prospective juror in a capital case for cause based on the prospective juror's views on capital punishment violates the defendant's right to an impartial jury under article I, section 16 of the California Constitution. (*People v. Thomas* (2011) 51 Cal.4th 449, 462 (*Thomas*); *People v. Griffin* (2004) 33 Cal.4th 536, 558 (*Griffin*); *People v. Ghent* (1987) 43 Cal.3d 739, 767.)

" 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made

statements that are conflicting or ambiguous.' " (*Thomas, supra,* 51 Cal.4th at p. 462, quoting *People v. Mayfield, supra,* 14 Cal.4th at p. 727.) " 'In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' " (*Thomas, supra,* at pp. 462-463, quoting *People v. Fudge* (1994) 7 Cal.4th 1075, 1094.)

Applying these precepts, we find no errors in the present case.

*(i) Prospective Juror B.M.*

Prospective Juror B.M.'s juror questionnaire revealed that she identified herself as a Christian and that she taught children's classes at her church. Although her church did not advocate for or against the death penalty, she was "unsure" whether she held "any religious or philosophical principle that would affect [her] ability to vote for the death penalty." In response to a question regarding her philosophical opinion regarding the death penalty on a scale from "strongly against" to "strongly in favor," she described herself as "neutral." When asked to describe her general feelings about the death penalty, she wrote: "I believe the law is the law, you must abide by the law of the land and if that means the person/s fall under that category, so be it. I myself really don't know how I feel about the death penalty. I believe that God allows certain things and it all depends. I am really unsure." As to her general feelings about the punishment of life without the possibility of parole," B.M. wrote, "I don't disagree with it. It all depends on the circumstances." When asked to choose which of the two punishments was the "more severe," she stated that her evaluation would depend

39

"on the person, one could be more severe than the other, so I choose neither one." When asked if she wanted to hear about a defendant's background and family before deciding on a penalty, she stated that it would depend upon the "nature of the crime" but when asked if she would consider such information if she was required to, she agreed that she would.

During oral voir dire conducted by the trial court, the court asked B.M. whether she could "realistically consider two options," one of which was the death penalty. B.M. replied that "it would be really, really difficult for me to make that decision." I mean it would take a whole lot before that decision could be made by me." When asked by the court to explain what she meant by a "whole lot," B.M. replied that "it is basically the whole circumstance . . . . I mean everything that's taken and accounted for. The evidence, the person, what — the circumstance, what happened, all of that." The court further investigated what B.M meant by a "whole lot" with the following exchange:

"Q: But when you talk about making that decision, is there something within you that you're kind of warning me about, that you might not be able to do that? You might not be able to realistically consider both choices because of your own feelings or the unsureness of your feelings?

"A: Yes.

"Q: As you — are there, now, realistically, practically thinking that you could keep an open mind, hear all of the evidence and depending on the evidence that you could impose the death penalty? Do you think you could?

"A: I don't know how to answer that. It really — I mean I — to me it would really take a whole — I mean when I say a whole, I don't know what would make it — I can't say that I wouldn't say no to the death penalty. But I — it would take a whole, whole, whole, lot.

"Q:    If an individual were charged with, oh, being a major participant in the holocaust, if an individual were charged with blowing up a public building with 200 people including infants in it are those things you think —

"A:    A possibility.

"Q:    — fit a whole lot?

"A:    Yes.

"Q.    If somebody's charged with shooting a gun and shooting several people, does that measure up to a whole lot in your mind?

"A.    No.  All depends on the state of mind too.

"Q:    Okay.  I understand as you're struggling with this trying to express your feelings, as I understand it, you're conveying that you really have a problem with the death penalty?

"A:    Yes.

"Q.    But you also have thought about it enough to appreciate a lot can go into it besides a body count; but then you also come back to the idea that you really have a problem with the death penalty?

"A:    Yes."

Michael's counsel questioned B.M. further, explaining that the law allowed for B.M. having a "hard time" imposing the death penalty but that the real question was whether she could be open to both options.  B.M. responded that "in my heart, it would make me sick to make that decision."  Michael's counsel restated the question, asking, "can you be open to that decision?"  B.M. replied, "yes."

The prosecutor did not question B.M. before challenging her for cause. Michael's counsel challenged the prosecutor's characterization of B.M. as having views that would substantially impair her ability to perform her duties as a juror in a capital case, pointing out that although B.M.'s views were equivocal, they were

41

no more weighted toward a particular penalty than the views of W.L. — a prospective juror whom defense counsel had unsuccessfully attempted to challenge for cause on the basis that his views revealed an impermissible bias *in favor* of the death penalty. The trial court agreed with the prosecutor and excused B.M for cause, noting that unlike juror W.L., who "was all over the place," Prospective Juror B.M. was very clear that she would be "sickened at the thought of" voting to execute someone, a statement which the court concluded "seemed to show the extremity of the situation." The court noted that B.M.'s demeanor reflected her difficulty, in that there were "five, six-second delays sometimes when she was asked about some of these questions. She was really struggling."

Substantial evidence supports the trial court's finding that Prospective Juror B.M.'s views on capital punishment would substantially impair her ability to perform the duties of a juror. In both her juror questionnaire and during voir dire, she asserted that she was unsure as to whether she could vote to impose the penalty of death, stating during voir dire that doing so would make her "sick to her stomach." Although it is true that in response to questioning by defense counsel, B.M. stated that she could be open to the decision of choosing between life imprisonment or death, her other answers revealed a deep reluctance to consider imposition of the death penalty.

We previously have held comments very similar to those made by B.M. provided substantial evidence to support a trial court's dismissal of a prospective juror for cause. In *Griffin, supra*, 33 Cal.4th at page 559, we held that the trial court properly excused for cause a prospective juror who stated on voir dire "that she did not know whether she *ever* could vote to impose the death penalty, regardless of the state of the evidence" and properly excused another prospective juror who stated she generally supported the death penalty but added that "she did not know whether she actually could vote to impose the death penalty." (*Id*. at

42

p. 560.) Moreover, the trial court noted on the record that B.M.'s manner of speaking — particularly her long pauses before answering — reflected a strong internal struggle regarding a willingness to impose the penalty of death. We defer to the trial court's evaluation of a prospective juror's state of mind. (*Thomas, supra,* 51 Cal.4th at p. 463.)

### (ii) Prospective Juror T.F.

In his questionnaire, Prospective Juror T.F. selected the responses indicating that he was "moderately in favor" of the death penalty and wrote that his general feelings about the death penalty were that it was "[h]ard to look at most of the time — I mean having to exercise it. I wonder if it is a deterrent at all. Overall, I believe there is a need for it." Asked his "general feelings" about life without parole, he replied that "it's better than death and leaves the door open for personal rehabilitation. It seems, however there are few systems in place to accomplish this." T.F. indicated he had no "religious or philosophical principle" that would affect his ability to vote for the death penalty and that "to be fair," he would want to know about the defendant's background.

On oral voir dire, Prospective Juror T.F. stated that he could consider both penalties, but "not without difficulty." Asked to clarify, he stated, "the death penalty is a very final penalty, so not to be considered lightly." He stated he would find it "very difficult" to vote for death and that he would be "more in favor of life imprisonment." Asked whether he could "practically" see himself voting for the death penalty, he stated, "I would have to be persuaded at that point by the evidence." After the trial court asked him if he had "prejudged," T.F. explained that, since being faced with the possibility of serving on this jury, he, upon further introspection of his thoughts and religious beliefs, now felt that he would be "more likely to sway or fall on the side of lenient punishment," even without "having

43

heard one fact, whatsoever." He characterized this feeling, as "[p]retty strong." Neither defense counsel nor the prosecutor questioned T.F., and the trial court granted the prosecutor's challenge for cause and dismissed T.F. without explanation or objection by defense counsel.

Although defense counsel's failure to object to T.F.'s removal did not forfeit this claim on appeal based on the then-applicable law,[10] we note that, by failing to question T.F., defense counsel relinquished "the opportunity to rehabilitate [T.F.] in an effort to show [he was] not excludable" (*People v. Mills* (2010) 48 Cal.4th 158, 188), and further suggests that "counsel concurred in the assessment that the juror was excusable" (*People v. Cleveland* (2004) 32 Cal.4th 704, 735). In any event, substantial evidence supports the trial court's finding that Prospective Juror T.F.'s views on capital punishment would substantially impair his ability to perform the duties of a juror. Although T.F. wrote in his questionnaire that he was moderately in favor of the death penalty and that he had no religious views or personal beliefs that would affect his ability to vote for it, his answers during voir dire reflected that he had changed his feelings and developed strong feelings against it. He stated repeatedly that he was more in favor of a sentence of life without the possibility of parole and that he would "sway" in favor of lenient punishment, without considering any evidence. These responses reflect a strong reluctance to impose the penalty of death, even in an appropriate case. "Those answers, in combination with the trial court's firsthand observations, could

---

**10**     As we recently explained, we now prospectively require the defense to "make either a timely objection, or the functional equivalent of an objection, such as a statement of opposition or disagreement, to the excusal stating specific grounds under [*Witherspoon v. Illinois* (1968) 391 U.S. 510 and *Wainwright v. Witt*, *supra*, 469 U.S. 412] in order to preserve the issue for appeal." (*People v. McKinnon* (2011) 52 Cal.4th 610, 643.)

44

give rise to a definite impression that [his] views on the death penalty would substantially impair the performance of his duties." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007.)

### *(iii) Prospective Juror E.R.*

In her juror questionnaire, Prospective Juror E.R. identified herself as moderately against the death penalty, explaining that she opposed its application except under "special and/or severe circumstances." She held no religious or philosophical principle that would affect her ability to vote for death. During voir dire, she was asked by the trial court whether there was a realistic possibility that she could impose the death penalty. She replied, "I'd have to know more about . . . the case than what you've told me, but generally speaking I'm not in favor of the death penalty." She agreed with the trial court's characterization that she had "not ruled out the possibility of imposing the death penalty, but that basically you don't think it should exist." When asked if she could give the People a "fair shake," she replied, "no, because I don't believe in the death penalty, basically." Defendant did not object to the court's excusal of Prospective Juror E.R. for cause, which suggests that "counsel accepted that the record as it stood was sufficient to support the intended ruling." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 644.)

Indeed, substantial evidence supports the trial court's order excusing Prospective Juror E.R. The trial court was justified in concluding that the prospective juror's views on capital punishment alone would substantially impair her ability to perform the duties of a juror. Aside from some heavily qualified assurances that she was not *categorically* against the death penalty, Prospective Juror E.F. was never able to state that she would be able to vote for the death penalty. She repeatedly stated that she was against the death penalty, and admitted that she would be unable to fairly assess the People's evidence. Substantial

45

evidence supported the trial court's determination that E.R.'s views substantially impaired her ability to serve as an impartial juror. (*Griffin, supra*, 33 Cal.4th at p. 559.)

### (iv) Prospective Juror D.L.

In his jury questionnaire, Prospective Juror D.L. identified himself as neutral regarding the death penalty, and stated that he held no religious or philosophical beliefs that would affect his ability to vote for death. He also stated that he did not believe that the death penalty is necessary. During voir dire, he questioned whether it would be appropriate to take a defendant's life "if it's not a serious killing" and stated that he did not see himself as someone who could impose the death penalty. The court then granted the prosecutor's challenge for cause without explanation or objection by defense counsel.

As previously noted, by failing to question D.L., defense counsel relinquished the opportunity to rehabilitate him to show that he was not excludable and counsel's conduct additionally suggests that counsel agreed that the juror was excusable. (*People v. Mills*, *supra*, 48 Cal.4th at p. 188; *People v. Cleveland*, *supra*, 32 Cal.4th at pp. 734-735; *People v. McKinnon*, *supra*, 52 Cal.4th at p. 644.) Moreover, substantial evidence supports the trial court's finding that Prospective Juror D.L.'s views on capital punishment would substantially impair his ability to perform the duties of a juror. As noted above, we held in *Griffin, supra*, 33 Cal.4th at page 560, that the trial court properly excused for cause a prospective juror who stated on voir dire that "she did not know whether she actually could vote to impose the death penalty." Prospective Juror D.L. explained that he did not believe the death penalty was necessary, felt it was inappropriate to impose the death penalty under most circumstances, and that he

did not feel he was the type of person that could vote to impose death. D.L.'s answers supported the trial court's order excusing him.

*(b) Failure to excuse juror for bias*

Defendant contends the trial court committed reversible constitutional error by including Juror No. 5 in the penalty jury, and refusing defendants' challenge to dismiss Juror No. 5 for cause. (*Wainwright v. Witt, supra*, 469 U.S. at pp. 423-424; *People v. Weaver* (2001) 26 Cal.4th 876, 910.)

Juror No. 5 indicated on his questionnaire that he was "moderately in favor" of the death penalty, and that his "general feelings" about the death penalty were an "eye for an eye" in some cases. He stated that he would not want to know about defendant's background in determining the appropriate penalty. If required to consider such information, he noted that "considerations are possible."

During voir dire, Juror No. 5 was asked by the trial court whether he could fairly evaluate all of the evidence in the case and keep open the option of either penalty, to which he responded, "I believe so." When questioned as to whether he could remain impartial if there were as many as three murder convictions and two attempted murder convictions, he answered, "Yeah, I think so." During questioning by Michael's counsel, Juror No. 5 explained that his statement about an "eye for an eye" reflected his belief that "[c]ertainly in some situations, when it's, I guess, beyond a reasonable doubt, you know, eye for an eye . . . and in a supposed civilized society, where a life is taken away for no reason, seemingly, as the Bible will state eye for an eye, you know if it was taken away for no real good reason . . . . I mean there's always reasons for something, but there's — if the society is going to maintain itself, something has to be done, I would think." When asked by counsel whether he would vote to impose the death penalty if defendants were found guilty beyond a reasonable doubt of the charges, "without

47

other considerations," Juror No. 5 stated that he would. The trial court posed a hypothetical involving a getaway driver in a bank robbery who was found liable for three murders that occurred during that robbery. Without providing any mitigating factors, the court asked whether Juror No. 5 believed death would be the appropriate punishment. He answered, "I believe so." Asked whether he could keep an open mind to hear the evidence regarding the appropriate punishment, he stated, "I'd try to keep an open mind." When asked, "do you think you'd be able to do that?," Juror No. 5 nodded his head.

Defense counsel asked whether Juror No. 5 would automatically vote for the death penalty if the defendants were found guilty of the charged offenses. He answered, "Well, I wouldn't automatically." Asked whether he would be inclined at the outset to impose the death penalty in such a case, Juror No. 5 answered, "yes." He stated it was "hard to say" and that "it depends" on the evidence put forth by the defense, and agreed that the burden would be on the defense to change his mind in such a case. In response to questions by the prosecutor, Juror No. 5 stated he would listen to evidence offered in mitigation at the penalty phase but affirmed that he would "[m]ore than likely" lean toward death if he knew only the basic facts of three murders and two attempted murders, although he again allowed that mitigation evidence "could" change his decision.

Defense counsel challenged Juror No. 5 for cause, but the trial court denied the challenge, stating its impression that Juror No. 5 had repeatedly conveyed that he was "pretty objective" about the death penalty, generally, and that multiple murders were merely aggravation that would make him lean toward death. The trial court also agreed with the prosecutor's impression that the questions defense counsel posed, because they contained only aggravating and no mitigating circumstances, elicited misleading answers from Juror No. 5.

48

The Attorney General contends defendant's claim is forfeited.  We agree.
Defendant, having chosen not to challenge Juror No. 5 peremptorily, and having
neither exhausted his peremptory challenges nor expressed dissatisfaction with the
jury, cannot raise on appeal the trial court's failure to excuse Juror No. 5.  " 'Under
our state law, a defendant who wishes to preserve a claim of error in the improper
denial of a challenge for cause must (1) use a peremptory challenge to remove the
juror in question; (2) exhaust his or her peremptory challenges or justify the failure
to do so; and (3) express dissatisfaction with the jury ultimately selected.' "
(*People v. Taylor* (2009) 47 Cal.4th 850, 884, quoting *People v. Blair, supra*, 36
Cal.4th at p. 741; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1290 [the
requirement of stating dissatisfaction applies to trials conducted after 1994
decision clarified the law].)

Defendant contends his claim is not forfeited because defendant did exhaust
his peremptory challenges in a subsequent proceeding in which alternate jurors
were selected, and one of those alternate jurors ultimately sat on defendant's jury.
This circumstance does not save defendant's claim because it has no bearing on
his failure to exhaust his peremptory challenges or his failure to express
dissatisfaction with the 12 jurors that included Juror No. 5.  As required, counsel
received a new set of peremptory challenges in the proceeding in which alternate
jurors were selected, and defense counsel expressed satisfaction with the alternate
jurors who were selected and later sworn to hear the penalty phase.  Under these
circumstances, "we adhere to the well-established rule that to preserve a claim a
biased juror was improperly permitted to serve, the defense must exhaust its
peremptory challenges and object to the jury as sworn." (*People v. Taylor, supra*,
47 Cal.4th at p. 885, citing *People v. Blair, supra*, 36 Cal.4th at p. 741.)

49

*(c) Alleged error in biased composition of jury*

Defendant presents several interrelated arguments that his constitutional rights to a fair trial and impartial jury were violated by the trial court and prosecutor's systemic and biased exclusion of jurors who were skeptical of the death penalty and by inclusion of jurors who were biased in favor of it, resulting in a jury unconstitutionally "culled of all those who revealed during *voir dire* examination that they had conscientious scruples against or were otherwise opposed to capital punishment." (*Adams v. Texas* (1980) 448 U.S. 38, 43.) We find no merit to defendant's contention.

Defendant urges us to perform a comparative analysis that he contends demonstrates that the trial court applied an arbitrary and capricious standard to the excusal of jurors for cause — excusing life-inclined jurors more frequently and with less hesitation than jurors who revealed a bias in favor of the death penalty. To support this contention, he compares the trial court's excusal for cause of Prospective Jurors B.M.,T.F., E.R., and D.L., with its refusal to excuse for cause Prospective Jurors M.L., Q.I., and L.W., who gave answers on their jury questionnaires, and in response to the court's oral examination, revealing that they would automatically vote for the death penalty. Prospective Jurors M.L., Q.I., and L.W. ultimately were dismissed for other reasons, and as we noted previously, defendant did not exhaust his peremptory challenges.

As set forth above, substantial evidence supported the trial court's excusal of Prospective Jurors B.M.,T.F., E.R., and D.L. for cause, obviating defendant's contention that the trial court's removal of these jurors was arbitrary and capricious. Moreover, defendant's claim fails because even assuming Prospective Jurors M.L., Q.I., and L.W. were biased, they did not serve on the jury and therefore could not possibly have affected the jury's fairness. (*People v. Yeoman* (2003) 31 Cal.4th 93, 114.) As we explained in *Yeoman,* "[a]n erroneous ruling

50

that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant '*can actually show that his right to an impartial jury was affected* . . . .' [Citation.] In other words, the loss of a peremptory challenge in this manner ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' [Citations.]" (*Ibid.*) In the present case, where defendant did not exhaust all his peremptory challenges, he cannot demonstrate that his right to an impartial jury was impaired by the trial court's refusal to excuse Prospective Jurors M.L., Q.I., and L.W. for cause, even assuming the trial court impermissibly applied differing standards to death-inclined jurors than it did to jurors who favored the penalty of life imprisonment.

Nor, contrary to defendant's contention, did the prosecutor's use of peremptory challenges to excuse prospective jurors who expressed reservations about the death penalty violate defendant's constitutional right to a representative jury. " '[W]e see no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death [citation], we have no proof that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges . . . against jurors harboring specific attitudes they reasonably believe unfavorable.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 983-984, quoting *People v. Turner, supra,* 37 Cal.3d at p. 315; see also *People v. Brown* (2004) 33 Cal.4th 382, 403 ["The prosecution's use of peremptory challenges to remove prospective jurors who express scruples about imposing the death penalty does not violate any constitutional guarantee."].)

## 2. *Asserted error stemming from court's modified lingering doubt instruction*

Defendant contends the trial court's lingering doubt instruction, by using the word "guilt," prevented the jury from considering any lingering doubt about the truth of the special circumstance, thereby violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and parallel provisions of the state Constitution. We disagree.

Defendant requested a pinpoint instruction informing the jury that, when determining penalty, it could consider any lingering doubt it had that defendant was the "actual shooter, intended to kill, or premeditated and deliberated." The trial court agreed it had discretion to provide a pinpoint instruction on lingering doubt, but stated that it did not agree with the language of defendant's proposed instruction. The trial court ultimately instructed the jury with a lingering doubt instruction that provided: "It may be considered as a factor in mitigation if you have a lingering doubt as to the guilt of the defendant." Defense counsel stated that although he preferred the instructional wording he had proposed, he was satisfied with the trial court's formulation. Thereafter, both the prosecutor and defense counsel argued the concept of lingering doubt to the jury.

The Attorney General contends the claim is forfeited because defendant did not object to the instruction, and in fact, stated that although he preferred the instruction as he had requested it, he was "satisfied" with the instruction as given. Although defense counsel did not object to the lingering doubt instruction provided to the jury, he did unsuccessfully request a lingering doubt instruction more closely tailored to the circumstances of the present case. Accordingly, defendant has preserved his claim on appeal. (*People v. Taylor* (2010) 48 Cal.4th 574, 628.)

The claim nevertheless fails on the merits. Although "[a] defendant has no federal or state constitutional right to have the penalty phase jury instructed to consider any" lingering doubts as to whether the defendant is guilty, "[t]his is not to say that the jury's consideration of any such doubt is improper; defendant may urge his possible innocence to the jury as a factor in mitigation." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1252.)

Defendant asserts that because the instruction as given utilized the word "guilt," it was insufficient to address any lingering doubt concerning the truth of the multiple-murder special circumstance. Defendant reasons that such a finding required a conclusion by the jury that he *intended* to kill the victims — a circumstance which did not necessarily depend upon defendant's "guilt" for his role in the murders. Thus, he contends, the jury was precluded from considering and giving effect to any lingering doubt that defendant was the actual shooter. We disagree.

Nothing in the proffered instruction or in the prosecutor's arguments to the jury conveyed to it that the issue of lingering doubt was limited to the substantive offenses and could not be considered in conjunction with the multiple-murder special-circumstance finding. To the contrary, the jury was instructed pursuant to CALJIC No. 8.85, that in assessing aggravation and mitigation, it must consider the circumstances of the crime, *any special circumstances*, defendant's level of participation, and any other extenuating circumstances. Additionally, the jury was told to disregard any instruction that appeared to conflict with this primary directive. The jury also was instructed pursuant to CALJIC No. 8.88 that it must consider mitigating factors, defined broadly as "any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."

53

Taken together, these instructions properly conveyed to the jury that its consideration of mitigation in general, and of lingering doubt as a factor in mitigation in particular, did, and must, extend to its consideration of the multiple-murder special circumstance. Thus, the jury was free to consider and give effect to any lingering doubt as to whether defendant was the actual shooter, or was, as he urges, a weaker accomplice influenced heavily by his older brother. Accordingly, there was no reasonable likelihood that the lingering doubt instruction, as given, prejudiced defendant, and we ascertain no error.

### 3. Asserted error in penalty phase based on omission of previously given instructions in guilt phase

In the guilt phase of defendant's trial, the trial court provided the standard instructions guiding the jury's consideration of evidence. At the penalty phase of the trial, the trial court instructed the jury pursuant to CALJIC No. 8.84.1, to disregard all guilt phase instructions omitted from the penalty phase, but the court failed to reinstruct the jury regarding the consideration and evaluation of evidence. Thus, as in *People v. Moon* (2005) 37 Cal.4th 1 (*Moon*), unlike with regard to the guilt phase, "the jury was not specifically instructed at the penalty phase how to consider statements by attorneys, testimony for which an objection was sustained, and insinuations couched in questions (CALJIC No. 1.02); nor was it instructed regarding the prohibition on independent investigation (CALJIC No. 1.03), the definitions of 'evidence,' 'direct evidence,' and 'circumstantial evidence' (CALJIC No. 2.00), how to consider inconsistent statements by witnesses (CALJIC No. 2.13), assessing the believability of a witness (CALJIC No. 2.20), the weighing of conflicting testimony (CALJIC No. 2.22), or the sufficiency of the testimony of a single witness (CALJIC No. 2.27)." (*Moon, supra,* at p. 36.)

Defendant contends the court's failure to instruct generally on these matters at the penalty phase trial violated his constitutional rights under the Eighth and

54

Fourteenth Amendments to the United States Constitution, as well as his rights under parallel provisions of the state Constitution.

In *Moon,* we held under identical facts that the trial court erred in failing to reinstruct with guilt phase instructions applicable in the penalty phase after giving a directive consistent with CALJIC No. 8.84.1. (*Moon, supra,* 37 Cal.4th at p. 37.) We also held, however, that a court's omission of the applicable instructions, though error, does not necessarily require reversal. (*Ibid.*) Instead, we evaluated "the nature of the evidence presented to determine whether it was likely the omitted instructions affected the jury's evaluation of the evidence" and concluded that in light of the relatively straightforward nature of the evidence presented by both the prosecutor and defendant at the penalty phase, defendant was not prejudiced by the omission of the instructions. (*Id.* at p. 38.)

In the present case, the prosecution relied upon the circumstances of the crime as a factor in aggravation, and the only new evidence presented by the prosecutor in the penalty phase of the trial was the testimony of family members of the victims, who testified regarding the loss and hardship they had experienced as a result of the deaths of their loved ones. In mitigation, defendant presented the testimony of numerous witnesses who testified generally regarding his good nature, educational failures and successes, and his lack of prior acts of violence. As in *Moon,* defendant called no expert witness to present his social history, and no forensic expert or mental health professional took the stand for either side. (*Moon, supra,* 37 Cal.4th at p. 38.) All penalty phase witnesses spoke from personal knowledge, and the prosecutor did not vigorously cross-examine any of defendant's character witnesses. Accordingly, as in *Moon,* "the penalty phase evidence was entirely straightforward, and the trial court's failure to reinstruct the jury with any applicable guilt phase instructions was harmless under any standard." (37 Cal.4th at p. 39.)

55

Defendant focuses primarily on the prosecutor's summation arguments in the guilt phase, contending that because of the absence of guilt phase instructions that would have instructed the jury regarding the proper scope of its consideration of arguments of counsel, the jury may have believed the prosecutor's guilt phase summation argument could be treated as evidence in the penalty phase of the trial. Thus, he contends, in the absence of the general instructions regarding evaluation of evidence, the jury reasonably believed that the same arguments of counsel it evaluated in the guilt phase could change character and be evaluated in a different manner in the penalty phase.

As evidence that he was prejudiced by this error, defendant claims the prosecutor falsely stated in his penalty phase closing argument that: (1) powder burns on victim Watchman indicated the gun had been fired from a short range, when there was no evidence of powder burns on any victim; (2) defendant had no *adult* felony conviction records, thereby improperly alluding to a juvenile history of violent crime that did not exist; (3) defendant would benefit from privileges from life in prison, such as family and conjugal visits, although prisoners sentenced to life without the possibility of parole are not entitled to overnight or conjugal visits with family; (4) victim Rodney James died of a heroin overdose two years after the shooting and that his drug use was attributable to the trauma he experienced after the shooting, when no evidence established that James died from a drug overdose or that any possible use of drugs was related to trauma from the shooting; (5) defendant's counsel was a skilled advocate who was misrepresenting the record — but in making the point, quoting from statements made by Michael's counsel, not defendant's counsel.[11]

---

[11] As we noted, *ante* at page 37, defense counsel did not object to these portions of the prosecutor's penalty phase closing arguments.

The first two complained-of statements were not false or misleading. Pathologist Van Meter testified that there were powder burns on Watchman's clothing which indicated that she had been shot from a distance of about two feet. The prosecutor also did not improperly allude to a nonexistent juvenile record when he stated to the jury that defendant's lack of an adult felony conviction record should not be a dispositive factor in mitigation. The statement was made to support the prosecutor's contention that defendant was not entitled to mercy simply because he started right "at the top" by committing multiple murders at 18 years of age.

Defendant is correct, however, that some of the statements identified above were erroneous. Prisoners serving sentences of life without the possibility of parole are not entitled to conjugal or overnight visits with family. There also was no evidence that victim James had died of a drug overdose or that he had turned to drugs to cope with the trauma of the shooting. Finally, the prosecutor did incorrectly attribute statements to defendant's counsel that had been made by Michael's counsel. But the misstated facts related to relatively minor points, and were not likely to sway the jurors when considered in the context of the substantial evidence presented at trial establishing that defendant intentionally killed three unarmed persons.

Moreover, as we concluded in *Moon,* defendant's contention that the absence of instruction led the jury to believe it could make a " 'standardless assessment of the evidence,' " is pure speculation. (*Moon, supra,* 37 Cal.4th at p. 39.) Contrary to defendant's assertion, nothing in the prosecutor's closing argument at the penalty phase suggested the jurors were free to recharacterize the arguments of counsel from the guilt phase as relevant evidence in the penalty phase, and no other evidence or instruction in the penalty phase suggested that the

distinction drawn between evidence and counsel's statements in the guilt phase was to be disregarded in the penalty phase.

Accordingly, we conclude the trial court's erroneous failure to reinstruct the jury pursuant to applicable guilt phase instructions was harmless because defendant " 'fails to demonstrate that the instructions given in his case, to a reasonable likelihood, precluded the sentencing jury from considering any constitutionally relevant mitigating evidence.' " (*Moon, supra,* 37 Cal.4th at p. 39, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1221.)

### 4. *Asserted error based on exclusion of mitigating evidence*

Defendant sought to admit the testimony of his father, Harry Souza, that when defendant and his brother Michael were in high school, Michael engaged in a fistfight to protect defendant. After the prosecutor objected to the testimony, defendant asserted the testimony was relevant because it "goes to family closeness." The trial court sustained the objection, noting defendant's proffered justification was "a bit far afield."

The trial court also sustained the prosecutor's objection to the admission of defendant's essay, titled "Someone who understands" which consisted of approximately 10 lines of text in which defendant described Michael as a person he trusts and turns to when he needs help. In the essay he described Michael as a person who would always stand by him, noting that the brothers played football together, and people understand each other best when they are faced with "bad and good times together." Defense counsel sought admission of the essay on the ground that it showed defendant's education level and progress. The trial court noted that other, more persuasive evidence had already been admitted on that point, and sustained the prosecutor's objection on hearsay grounds.

58

Defendant now contends that by refusing to permit admission of this evidence, the trial court violated his state and federal constitutional rights to due process, to present a defense, and to a reliable penalty verdict. We conclude there was no error.

" 'The Eighth and Fourteenth Amendments require the jury in a capital case to hear any relevant mitigating evidence that the defendant offers, including " 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 352.) The court, however, has the authority to exclude as irrelevant evidence that does not bear on the defendant's character, record, or the circumstances of the offense. (*Id.* at p. 353.) "The trial court determines relevancy of mitigating evidence and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1145.)

In the present case, neither Harry Souza's anecdote about Michael participating in a fistfight nor the essay written by defendant about Michael's trustworthiness had any bearing on *defendant's* character, prior record, or the circumstance of the offense, and therefore, there was no abuse of discretion in the trial court's refusal to admit the evidence in mitigation. (*People v. Hamilton* (2009) 45 Cal.4th 863, 923.) Instead, this evidence highlighted *Michael's* good character in protecting and caring for defendant.

Defendant contends on appeal that the circumstance that Michael engaged in a fistfight to protect defendant was relevant to the circumstances of the crime — the incident tended to support defendant's defense that Michael was the leader, and defendant the follower, on the night of the crimes. Defendant's only theory for relevance at trial was "family closeness," however, and he may not now, for

the first time on appeal, assert this alternate ground for relevance. (Evid. Code, § 354; *People v. Fauber* (1992) 2 Cal.4th 792, 831 [on appeal, a defendant cannot raise grounds of admissibility which were not presented to the trial court].) The same is true of defendant's assertion, for the first time on appeal, that defendant's essay tended to humanize him by illustrating the close, loving relationship he shared with his brother.

In any event, there was no prejudicial error. Defendant presented abundant evidence in mitigation tending to establish that defendant had a close, loving relationship with his family in general, and with Michael in particular, including the testimony of defendant's father and sister that defendant and Michael were particularly close and that Michael was the "leader" among the two. With regard to the essay, which defendant sought to introduce to show his educational achievements, defendant presented the testimony of five of his former teachers, who testified extensively regarding defendant's strong work ethic, intelligence, and positive attitude. Additionally, the educational coordinators of the adult school district that included the Santa Rita jail testified specifically that during his incarceration, defendant was a diligent and dedicated student. Accordingly, "[t]he jury was allowed to hear and consider the essence of the mitigating evidence," and any error was harmless. (*People v. Hughes* (2002) 27 Cal.4th 287, 397.)

> 5. *Asserted error based on instruction regarding victim impact evidence*

The prosecutor requested a special instruction pinpointing victim impact evidence as a circumstance of the crime within the meaning of section 190.3, subdivision (a). Over defendant's objection that the requested pinpoint instruction was argumentative, the trial court included the requested language in paragraph (a) of CALJIC No. 8.85, which instructed the jury concerning the factors in aggravation and mitigation that it was permitted to consider. As modified, the

60

instruction advised the jury to consider: "(a) The circumstances of the crimes of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true. *As part of the circumstances of the offense under factor A, you may also consider the testimony offered in this penalty phase portion of the trial concerning the impact of the crimes on the family and friends of the victims.*"

Defendant contends inclusion of this pinpoint instruction was error because the instruction as given was incomplete and improper. Specifically, he asserts the instruction was improperly argumentative because it highlighted certain aspects of the evidence without explaining the legal limitations on the use of such evidence. (*People v. Fauber, supra,* 2 Cal.4th at p. 865.) Relying on several out-of-state decisions, defendant contends that, under both state law and the Eighth Amendment, the trial court should have instructed on the proper use of victim impact testimony. He contends that a proper instruction would have told the jury the following: it could consider victim impact evidence, which shows that the victim was a unique individual, as a circumstance of the capital crime, but the law deems no one life more valuable than another. Thus, the jury must confine itself to a "rational inquiry into the culpability of the defendant, not an emotional response to the evidence." Furthermore, it must not consider the opinions of the victim's survivors, or any other member of the community, as to the appropriate punishment. Defendant contends the trial court's failure to so instruct the jury violated the federal Constitution and requires reversal. We disagree.

We have repeatedly held that it is not error to refuse an instruction substantially identical to that requested by defendant here. Nor is it error, if the court fails, on its own motion, to give an instruction substantially identical to the one defendant proposes. We have explained that these proffered instructions are misleading insofar as they suggest the jury may not be moved by sympathy for the

61

victims and their survivors, and that the standard instructions and the pinpoint instruction actually given here adequately convey to the jury the proper consideration and use of victim impact evidence.  (*People v. Harris, supra,* 37 Cal.4th at pp. 358-359; see also *People v. Tate* (2010) 49 Cal.4th 635, 708; *People v. Bramit* (2009) 46 Cal.4th 1221, 1245; *People v. Zamudio* (2008) 43 Cal.4th 327, 368–370; *People v. Valencia* (2008) 43 Cal.4th 268, 310; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195.)  We reaffirm those conclusions here.

### 6.  *Alleged cumulative error*

Defendant asserts that numerous alleged errors committed during both the guilt phase and the penalty phase of his trial, even if not individually requiring reversal of the judgment, cumulatively impacted the jury's penalty determination and require reversal of the judgment of death.  As set forth above, the only errors we have identified are the trial court's failure to reinstruct the jury with certain guilt phase instructions after instructing them pursuant to CALJIC No. 8.84.1, and the improper provision of CALJIC No. 17.41.1, but as also explained above, neither error was prejudicial.  Accordingly, we find no error, whether considered singly or cumulatively, that would warrant reversal.

### 7.  *Special instructions regarding mitigating factors*

Defendant contends the trial court erred by refusing to give his proffered instruction concerning the distinction between (and the proper use of) aggravating and mitigating factors.  He asserts this error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and parallel provisions of the state Constitution.  The instruction would have advised the jury that it might consider any evidence in mitigation (including evidence not encompassed by the specific mitigating factors listed in the instruction) and that any mitigating factor, standing alone, could support a determination that death was

not the appropriate punishment in this case. Defendant also sought to have the jury instructed that mitigating circumstances do not have to be proved beyond a reasonable doubt, and that a juror may find the existence of a mitigating factor if there is any evidence, however weak, to support it. Finally, defendant sought to instruct the jury that it was permitted to use mercy, sympathy, and sentiment in deciding what weight to accord to each mitigating factor.

We have rejected claims of error for refusing an instruction identical to that sought by defendant. (*Avila II, supra,* 46 Cal.4th at p. 722.) As we explained in *Avila II*, the instruction was properly refused as duplicative, and other instructions adequately conveyed to the jury the definition of mitigating and aggravating circumstances, and that sympathy and pity should be taken into consideration. (*Ibid.*) Indeed, we have held CALJIC No. 8.85, the pattern instruction that set forth the mitigating factors to be considered by the jury in making its penalty determination, to be "correct and adequate." (*People v. Valencia, supra,* 43 Cal.4th at p. 309.) "Moreover, a trial court is not required to instruct the jury that mitigating evidence need not be proved beyond a reasonable doubt." (*Avila II, supra*, 46 Cal.4th at p. 722.) There was no error.

### 8. *Asserted error from instruction pursuant to CALJIC No. 8.85*

Defendant contends that asserted defects in pattern instruction CALJIC No. 8.85 prejudicially affected the jurors' understanding of their weighing function, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. We decline to reconsider our prior decisions holding that (1) this instruction is not flawed for its failure to identify which facts may be considered aggravating and which may be considered mitigating (*People v. Cruz* (2008) 44 Cal.4th 636, 681; *Valencia, supra,* 43 Cal.4th at p. 309 ["CALJIC No. 8.85 is both correct and adequate"]); (2)

63

the trial court is not compelled to delete assertedly inapplicable factors from the instruction (*People v. Farnam* (2002) 28 Cal.4th 107, 191-192); and (3) the instruction does not " 'encourage the double counting of aggravating factors.' " (*People v. Ayala* (2000) 24 Cal.4th 243, 289.)

### 9. Asserted error from instruction pursuant to CALJIC No. 8.88

The trial court instructed the jury in the language of CALJIC No. 8.88, which defines factors in aggravation and mitigation. Defendant asserts the court erred by refusing to give the modified version of the instruction he requested regarding the proper manner of weighing aggravating and mitigating factors. We repeatedly have held that the standard version of CALJIC No. 8.88 is adequate and correct. (*People v. Boyette* (2002) 29 Cal.4th 381, 464-465; *People v. Gutierrez, supra,* 28 Cal.4th at pp. 1160-1161; *People v. Gurule* (2002) 28 Cal.4th 557, 661-662.) We decline to reconsider that issue here.

### 10. Asserted unconstitutionality of multiple-murder special circumstance

Defendant contends that the multiple-murder special circumstance found true in the present case violates the Eighth Amendment of the federal Constitution because it does not adequately narrow the class of murders subject to the death penalty. We repeatedly have rejected this claim and we do so again in the present case. (*People v. Verdugo* (2010) 50 Cal.4th 263, 304; *People v. Sapp* (2003) 31 Cal.4th 240, 286-287.)

*11. Constitutionality of California's death penalty scheme*[12]

Acknowledging the same arguments have been raised and rejected in numerous previous decisions, defendant contends several features of California's capital sentencing scheme violate provisions of the federal Constitution, and he presents those arguments in abbreviated form. (*People v. Schmeck* (2005) 37 Cal.4th 240, 304 [claims "presented to this court primarily to preserve them for review by the federal courts" may be "stated in a straightforward manner accompanied by a brief argument"].) We reject those claims for the reasons given in our precedents.

The list of special circumstances qualifying a first degree murder for capital sentencing (§ 190.2) is not impermissibly broad. (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) Section 190.3, factor (a), under which the jury may consider the "circumstances of the crime" as a factor in aggravation or mitigation of penalty, is not so broad as to make imposition of a death sentence arbitrary and capricious. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1066 (*Brasure*).)

The death penalty statute " ' "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." . . . [B]ecause the assessment of aggravating and mitigating circumstances required of penalty jurors is inherently " 'normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification," ' " the trial court was not obligated to instruct the jury that

---

[12] In his reply brief, defendant withdraws two death-penalty-related claims for purposes of this appeal only: that intracase proportionality review should result in the reversal or modification of his judgment of death; and that California's methods of execution are unconstitutional.

aggravating factors must be proven by a preponderance of the evidence. (*Brasure, supra,* 42 Cal.4th at p. 1067, quoting *People v. Bell* (2007) 40 Cal.4th 582, 620.) "No 'tie-breaking rule' is necessary, and the jury need not be instructed that there is no burden of proof." (*People v. Brady* (2010) 50 Cal.4th 547, 590.)

The failure of California's death penalty law to require intercase proportionality does not violate the federal Constitution. (*People v. Verdugo, supra*, 50 Cal.4th at p. 305.) Nor does the death penalty law violate equal protection principles because disparate sentence review has, in the past, been provided to noncapital defendants. "Because capital and noncapital defendants are not similarly situated in the pertinent respects, equal protection principles do not mandate that capital sentencing and sentence-review procedures parallel those used in noncapital sentencing." (*Brasure*, *supra*, 42 Cal.4th at p. 1069.) The use of the limiting adjectives "extreme" and "substantial" in the instruction concerning section 190.3, factors (d) (referring to "extreme mental or emotional disturbance") and (g) (referring to "extreme duress" and "substantial domination" by another) does not unconstitutionally prevent the jury from considering mitigating evidence. (*People v. Taylor, supra*, 47 Cal.4th at p. 899.) "No instruction on a presumption that the sentence should be life without parole, rather than death, was constitutionally required." (*Ibid*.)

Finally, defendant contends that the asserted denials of his state and federal constitutional rights constitute violations of international law because the United States is in the minority of nations worldwide that regularly permit capital punishment and because the International Covenant on Civil and Political Rights prohibits the arbitrary deprivation of life. We previously have rejected identical arguments. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1142-1143.)

66

## 12. *Alleged erroneous imposition of restitution orders*

The trial court imposed a $10,000 restitution fine under section 1202.4. Additionally, the court ordered defendant to pay a total of $14,178.73 restitution to the victim/witness compensation program to reimburse it for compensating the victims' families for their losses resulting from the crimes. Defendant contends the restitution order was improperly imposed because the trial court applied the law of restitution that applied at the time of defendant's sentencing in 1999, rather than the law applicable at the time of the crimes in 1993, thereby violating the ex post facto clause of the United States Constitution. The Attorney General concedes error and agrees that defendant is entitled to a remand to the trial court for recalculation of restitution orders.

It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. (*Avila II, supra,* 46 Cal.4th at p. 728; *People v. Saelee* (1995) 35 Cal.App.4th 27, 30; *People v. Hanson* (2000) 23 Cal.4th 355, 361-363; *People v. Walker* (1991) 54 Cal.3d 1013, 1024.)

At the time the crimes were committed, former section 1202.4 and Government Code former section 13967 required setting a restitution fine of between $200 to $10,000, but additionally provided that in a case in which a victim has suffered an economic loss as a result of a defendant's conduct, a court may order that restitution be paid directly to the victim in the amount of the losses, "in lieu of imposing all or a portion of the restitution fine." (Former Gov. Code, § 13967, subd. (c), as amended by Stats. 1990, ch. 45, § 2, , p. 256; see Stats. 1990, ch. 45, § 4, p. 261, amending Pen. Code, former § 1202.4; Stats. 1992, ch. 682, § 4; p. 2922, amending Gov. Code, former § 13967.) The relevant statute in existence at the time of sentencing in 1999 did not require the court to offset a

67

direct victim restitution order with a reduction or elimination of the restitution fine.  (Former § 1202.4, subds. (b)(1), (d), (f).)

Defendant correctly observes that the trial court's restitution fine of $10,000 combined with its order of $14,178.73 in victim restitution violates the statutory maximum as defined by the statutes applicable at the time of defendant's crimes, which by their terms allowed such victim restitution only in lieu of all or a portion of the restitution fine.  (*People v. Kwolek* (1995) 40 Cal.App.4th 1521, 1536.)

Moreover, the final restitution orders, as described in the abstract of judgment, contain several inconsistencies when the reporter's transcript is compared with the minute order and with the probation report.  First, the minute order ascribes a $5,500 loss to Regina Watchman, whose family did not submit any compensation claim.  Instead, the reporter's transcript and probation report reflect that Alice Arnold submitted a restitution claim for $5,500 for Dewayne Arnold's funeral and burial services.  Second, the trial court's order in the reporter's transcript reflects Alice Arnold's total loss as $5,500, but also separately lists Arnold as having been compensated in the amount of $2,059.33 by the victim/witness compensation program for funeral and burial services.  The victim/witness program, therefore, should be compensated $2,059.33 and Arnold $3,440.67.  (*People v. Kwolek*, *supra*, 40 Cal.App.4th at p. 1534 ["a governmental agency qualifies as a 'victim' within the meaning of [former] Government Code section 13967, subdivision (c)"].)  Third, based on the reporter's transcript, the trial court appears to have misstated the amount paid to Marlene Besoni by the victim/witness compensation program, indicating $2,246 instead of $2,446, as reflected in the probation officer's report.  The victim/witness program, therefore,

should be compensated $2,446.[13]  Finally, because the remaining amounts attributable to the victim/witness compensation program total $3,510, the grand total of the amounts of restitution ordered does not match the trial court's stated grand total of $13,678.73, but instead equals $12,119.40.

In light of these errors, we recalculate the restitution orders as follows:  the $10,000 restitution fine is stricken; Alice Arnold is awarded $3,440.67 in victim restitution; and the victim/witness compensation program is awarded $8,678.73 in victim restitution.  Thus, defendant is ordered to pay a total of $12,119.40 in victim restitution.

---

[13]     In addition, also based on the reporter's transcript, the trial court appears to have misstated the amount paid to Beulah John by the victim/witness compensation program, indicating $663 instead of $663.40, as reflected in the probation officer's report.  The victim/witness compensation program, therefore, should be compensated $663.40.

### III. CONCLUSION

For the foregoing reasons, the $10,000 restitution fine is stricken and the amounts awarded to the victim/witness compensation program are stricken. The restitution orders are modified to award Alice Arnold $3,440.67 in victim restitution and to award the victim/witness compensation program $8,678.73 in victim restitution. As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment to reflect the modification of victim restitution as described above. The clerk of the superior court also is directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

70

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Souza

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076999
**Date Filed:** May 31, 2012

_____

**Court:** Superior
**County:** Alameda
**Judge:** Joseph Hurley

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and C. Delaine Renard, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega, William Kuimelis and Donna M. Provenzano, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

C. Delaine Renard
Deputy State Public Defender
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Donna M. Provenzano
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5873