Filed 6/2/21  P. v. Nieto CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074435 |
| v. | (Super.Ct.No. FWV17004499) |
| JOHN NIETO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Jon D. Ferguson, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Kathryn Kirschbaum and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted John Nieto of first degree murder. (Pen. Code, § 187, subd. (a); unlabeled statutory references are to this code.) He was sentenced to 25 years to life in state prison.

On appeal, Nieto argues that the trial court prejudicially erred by (1) failing to define the term "provocation" in the jury instruction pertaining to second degree murder, and (2) improperly answering a jury question seeking clarification of the distinction between the degrees of murder. We affirm.

BACKGROUND

A.    *The Perceived Conflict*

Nieto started dating Elisabeth M. in 2011. They had a child together and started living together in 2014. In 2017, Elisabeth began working at a new job. She sometimes gave a coworker, John Doe, rides to and from work.

In October 2017, Nieto found text messages between Doe and Elisabeth on Elisabeth's cell phone, and the messages led Nieto to believe that Elisabeth was cheating on him with Doe. Nieto slapped Elisabeth and demanded that she no longer have any contact with Doe. Elisabeth broke up with Nieto and moved out of their shared residence, taking their child with her.

B.    *The Killing*

On November 22, 2017, Elisabeth gave Doe a ride after work and dropped him off in the parking lot of a 7-Eleven store near his home. As Elisabeth was exiting the parking lot, she noticed Nieto in his pickup truck exiting a parking lot across the street. The truck

2

passed in front of her car with its lights off. Doe was walking on the sidewalk toward the intersection and stopped at the corner. Nieto pulled into the 7-Eleven parking lot and made a U-turn, which caused his tires to screech.

Nieto attempted to hit Doe with his truck as Doe was crossing the street. Elisabeth honked her horn to get Doe's attention. Doe ran and avoided being hit. Doe initially sought shelter between two electrical boxes in a parking lot. Driving fast, Nieto followed Doe into the parking lot. Doe took cover between the electrical boxes for a couple of seconds. Doe then ran back across the street toward the 7-Eleven. Nieto turned his truck around, "burned rubber," "floored" the vehicle, and chased after Doe. Nieto drove his truck over the curb and into Doe, crushing him against a wall. Nieto's truck was destroyed in the impact, which also caused the front tires to blow out and the hood to fly up. Nieto exited the truck and ran away. Within minutes of being struck, Doe died from multiple blunt force injuries.

When Elisabeth saw Nieto chasing Doe toward the 7-Eleven, she drove back into the 7-Eleven parking lot. After Nieto struck Doe, Elisabeth got out of her car and saw Doe lying on the ground. Elisabeth then left the 7-Eleven parking lot and picked up Nieto.

C.    *Nieto's Interview with Law Enforcement*

The next morning, law enforcement officers took Nieto into custody. An officer interviewed Nieto. Nieto initially claimed that he did not remember what happened and that he did not "even know" Doe and had never seen Doe before. But Nieto subsequently

3

explained that he "just wanted to fucking run [Doe] over" because Nieto believed that Elisabeth was cheating on Nieto with Doe.

Sometime shortly after Halloween (two to three weeks before the killing), Nieto had called Doe. Nieto told Doe to "step off," and Doe responded that he would and understood Nieto's concerns. Nieto warned that Doe "better watch out," and that Doe was "gonna get [himself] into problems." Nieto told Doe that he would "do whatever [he] ha[d] to for [his] family." Nieto described the conversation with Doe as the two men "talking cool" with "no arguing, no screaming through the phone or nothing."

By reading Elisabeth's text messages, Nieto learned that when Elisabeth gave Doe rides home from work she typically dropped off Doe at a particular 7-Eleven. Nieto tried to call Elisabeth the day of the incident because it was her birthday. Elisabeth did not answer his calls, which angered him. Nieto "had a feeling" that Elisabeth was going to drop off Doe at the 7-Eleven that night, so Nieto went there, parked in a different parking lot, and waited while thinking to himself "fuck it, I'm ruining [Doe's] Thanksgiving and fuckin' holidays. [F]uckin' kill him."

Nieto was watching from his truck as Elisabeth drove into the 7-Eleven parking lot. Doe exited Elisabeth's car, and Nieto "just went crazy and like just furious and I don't know what the fuck I did. I just wanted to fuckin' kill him." After Doe exited Elisabeth's car, Nieto saw Doe walk to the sidewalk, wait for the light, and then start crossing the street in the crosswalk; Nieto then "stepped on it" and "tried to hit" Doe. Elisabeth honked her horn, so Doe "dodged" Nieto's car and started running. Nieto said

4

he then "busted a bitch and went back; I'm gonna get you, man." Nieto described Doe as running one way and then running in a different direction when Nieto "kind of got in front of him." When Doe "ran back" in the other direction, Nieto "just got on top of the curb and I said fuck him, I'm just gonna run him over, so I got on top of the curbs and then I just went this way, and he started running this way, so I guess I just caught up to him. I just went on top of the curbs again. I just bounced." Nieto was not certain how fast he was going when he hit the wall, but he had "floored it" with the gas pedal pressed "all the way down" until he hit the wall. Nieto said he "just lost [his] mind."

Nieto claimed that when he hit the wall he had not seen whether he hit Doe. But Nieto "didn't really care if [Doe] died or not, just fuckin' hit him and that's it." When the interviewer informed Nieto that he had hit Doe, who had died, Nieto responded, "Well fuck it he looked for it, man." Nieto also said "I don't regret it" and repeatedly said that Doe "asked for it" and "deserved it." Nieto said that he would tell his son the truth about what happened and tell him, "yeah, fuckin' I did it and I don't regret it, you know."

D.    *Defense Evidence*

A clinical and forensic psychologist who had evaluated Nieto testified on Nieto's behalf. She opined that Nieto was an impulsive gratification seeker with a slightly below average IQ who has impulse control problems and difficulty "thinking before he acts." From Nieto's self-reporting, the psychologist found that Nieto had "a very high probability of a number of substance abuse problems that are quite severe," including using methamphetamine.

5

E.      *Theories of the Case*

The prosecution argued that Nieto committed first degree murder under two possible legal theories:  (1) with premeditation and deliberation and (2) by lying in wait. Defense counsel argued that Nieto was guilty of only voluntary manslaughter.  Counsel argued that Nieto acted in the heat of passion as a result of provocation negating malice. Counsel never argued that the jury should find Nieto guilty of second degree murder because of provocation that made Nieto subjectively unable to premeditate or deliberate.

DISCUSSION

A.      *Relevant Principles of Homicide*

""""Homicide is the killing of a human being by another . . . ."'"  [Citation.] Criminal homicide is divided into two types:  murder and manslaughter.  'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.'  (§ 187, subd. (a).)  Malice aforethought may be express or implied.  (§ 188.)" (*People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).)  "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder."  (*Id.* at p. 942.) Likewise, lying in wait "is a means of proving first degree murder.  'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.'"  (*People v. Sandoval* (2015) 62 Cal.4th 394, 416; § 189, subd. (a).)

"'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'"  (*Beltran*, *supra*,

56 Cal.4th at p. 942.) To reduce a murder to second degree, "premeditation and deliberation may be negated by heat of passion arising from provocation." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter." (*Ibid.*)

B.     *Instructional Error*

The jury was instructed with the standard instructions for degrees of homicide (CALCRIM No. 520), first degree murder (CALCRIM No. 521), provocation (CALCRIM No. 522), and voluntary manslaughter (CALCRIM No. 570). CALCRIM No. 522 was given as follows: "Provocation by the victim may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked by the victim, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (CALCRIM No. 522.) Nieto did not request any clarification or modification of any of the instructions.

The jury was also instructed on voluntary manslaughter according to a modified version of CALCRIM No. 570 as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked by the victim; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

Nieto argues that "the term provocation in the context of second degree murder has a technical meaning peculiar to the law," which relates to the effect that the provocation has on a defendant's subjective state of mind as opposed to the objective reasonableness of the provocation necessary to reduce the crime to voluntary manslaughter. Because of that purported technical meaning, he argues that the trial court had a sua sponte obligation to modify CALCRIM No. 522 to instruct the jury on that meaning. In essence, he argues that CALCRIM No. 522 is misleading because it does

8

not define the term "provocation" for second degree murder as being subjective.  We are not persuaded.[1]

Absent a request, the trial court has no sua sponte obligation to instruct on provocation for second degree murder, because it is a pinpoint instruction.  (*People v. Rivera* (2019) 7 Cal.5th 306, 328.)  Even when a trial court "has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly."  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)  In addition, the trial court generally "has a sua sponte duty to give amplifying or clarifying instructions '"where the terms used [in an instruction] have a technical meaning peculiar to the law."'"  (*People v. Richie* (1994) 28 Cal.App.4th 1347, 1360.)  "'"A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning."'"  (*People v. Cross* (2008) 45 Cal.4th 58, 68.)  We independently review whether a jury instruction correctly states the law.  (*People v. Bates* (2019) 35 Cal.App.5th 1, 9.)

Other courts have concluded that CALCRIM No. 522 is not misleading.  On appeal from a first degree murder conviction, the defendant in *Hernandez, supra*, 183 Cal.App.4th 1327, argued that CALCRIM No. 522 was incomplete and misleading in part because it did not instruct the jury that provocation insufficient to reduce the crime to

---

[1]    Because we conclude that the trial court did not err, we need not and do not address the People's contention that Nieto forfeited this argument by failing to request a clarifying instruction in the trial court.  (See *People v. Mayfield* (1997) 14 Cal.4th 668, 778-779, abrogated on another ground by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)

manslaughter could be sufficient to reduce the crime to second degree murder. (*Hernandez*, at p. 1332.)  The court rejected the argument, explaining:  "CALCRIM No. 522 instructs the jury to 'consider the provocation in deciding whether the crime was first or second degree murder' and 'consider the provocation in deciding whether the defendant committed murder or manslaughter.'  Thus, the instruction plainly states the jury should consider provocation for *both* second degree murder and manslaughter."  (*Id.* at p. 1335.)

Relying in part on the analysis in *Hernandez*, *supra*, 183 Cal.App.4th 1327, *People v. Jones* (2014) 223 Cal.App.4th 995 (*Jones*) rejected the defendant's argument that the instructions on provocation for second degree murder and voluntary manslaughter were misleading because they did not "inform the jury that the objective standard applies only for reduction of murder to voluntary manslaughter, and does not apply to reduce first to second degree murder."  (*Jones*, *supra*, at p. 999.)  There, as here, the jury was instructed with CALCRIM Nos. 520, 521, 522, and 570.  (*Ibid.*)  *Jones* concluded that the instructions given accurately stated the law.  The court explained that the instructions "accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed.  CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.'  [Citation.]  As the jury also was instructed [with CALCRIM No. 570], a reduction of murder to voluntary manslaughter

10

requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment. [¶] There was no error in giving these instructions." (*Id.* at p. 1001.)

We agree with the reasoning and analyses in *Jones*, *supra*, 223 Cal.App.4th 995, and *Hernandez*, *supra*, 183 Cal.App.4th 1327. CALCRIM No. 522 accurately describes the law as it pertains to provocation for second degree murder and is not misleading.

Nieto claims that *Jones*, *supra*, 223 Cal.App.4th 995, and *Hernandez*, *supra*, 183 Cal.App.4th 1327, are inapposite because the defendants in those cases did not address the same argument that Nieto makes about provocation having a technical meaning peculiar to the law. Regardless of the issues addressed or not addressed in *Jones* and *Hernandez*, our Supreme Court has held that in cases in which the evidence is not sufficient to support an instruction on voluntary manslaughter the term provocation as used in the provocation instruction bears its "common meaning," which requires "'no further explanation in the absence of a specific request.'" (*People v. Souza* (2012) 54 Cal.4th 90, 118 (*Souza*); *People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218 (*Cole*).) *Souza* and *Cole* involved the CALJIC version of the provocation instruction for second degree murder (CALJIC No. 8.73). (*Cole*, *supra*, at p. 1217; *Souza*, *supra*, at pp. 117-118.) Nieto did not cite the Supreme Court precedent on this issue in his opening brief and did not respond in his reply brief to the People's argument on this point. He has

11

therefore provided no argument as to why or how the term "provocation" should be treated differently in CALCRIM No. 522 or in the circumstances of this case. We are bound by Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In addition, in rejecting another component of the defendant's challenge to CALCRIM No. 522, *Hernandez*, held that provocation "was not used in a technical sense peculiar to the law." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.) Quoting a dictionary, *Hernandez* explained that "[p]rovocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.'" (*Ibid.*) As *Hernandez* explained, that definition of "provocation" comports with its meaning in the law (*ibid.*), which our Supreme Court has explicated as follows: "The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state." (*People v. Ward* (2005) 36 Cal.4th 186, 215.) Given the common meanings of the terms "provocation" and "provoke," *Hernandez* concluded that "the jurors would have understood that provocation (the arousal of emotion) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez*, at p. 1334.)

Nieto argues that *Hernandez*, did not include any "discussion of the subjective standard of provocation in the context of second degree murder and the objective standard of provocation in the context of voluntary manslaughter based on heat of passion." The argument mischaracterizes *Hernandez*, which explained that provocation

12

sufficient for voluntary manslaughter is based on objective reasonableness and provocation for second degree murder is based on a subjective state of mind. (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.) Thus, although *Hernandez* did not mention that distinction in its analysis of whether the term "provocation" has a technical legal meaning, the court was aware of the different standards for provocation when it held that CALCRIM No. 522 uses the term "provocation" in a nontechnical manner.

We also reject Nieto's attempt to distinguish *Hernandez*, on the ground that the jury in *Hernandez* was not instructed with CALCRIM No. 570, which sets forth the objective standard of provocation necessary to reduce murder to voluntary manslaughter. As the court explained in *Jones*, CALCRIM No. 522 is not misleading when given along with CALCRIM No. 570. (*Jones, supra*, 223 Cal.App.4th at p. 1001.) We agree with *Hernandez* that provocation in CALCRIM No. 522 does not have a technical meaning peculiar to the law (*Hernandez, supra*, 183 Cal.App.4th at p. 1334), even when given along with CALCRIM No. 570, as it was here.

For all of these reasons, we conclude that the trial court did not err by failing to clarify sua sponte the term "provocation" in CALCRIM No. 522, which has a common meaning and not a technical meaning peculiar to the law.

C.     *Jury Question*

Nieto argues that the trial court prejudicially erred by improperly answering a question posed by the jury during deliberations. We conclude that the argument lacks merit.

13

1. *Relevant Proceedings*

During deliberations, the jury sent the following note to the court: "Can we please get clarification on Cal Crim 521 lines 3 through 5? [¶] Is it two separate theories? [A]nd does it require both? [¶] [A]lso any clarification on the differences between 1st degree [and] 2nd degree murder would be appreciated." Outside the presence of the jury, the trial judge explained to counsel that he interpreted the note as containing three subparts and thus had drafted a written response to each of those subparts. The prosecutor and defense counsel confirmed that they had read the court's proposed responses and that they agreed with the proposed answers. The court sent the written response to the jury.

In response to the jury's first question seeking clarification on lines three through five of CALCRIM No. 521, the court wrote: "Based on your question, we cannot offer clarification beyond what is contained in the 521 instruction itself."[2] Responding to the second part of the jury's question about the two theories of first degree murder, the court wrote: "The defendant is being prosecuted under 2 theories of first degree murder. The defendant cannot be found guilty of first degree murder unless *all* of you agree that the people have proved *all* of the elements of *one* of those theories. However, you do not need to all agree on the same theory. The theories are described, along with the elements that must be proved beyond a reasonable doubt, in Calcrim 521." In response to the

---

**2**    Lines three through five of CALCRIM No. 521 read: "The defendant has been prosecuted for first degree murder under two theories: (1) the murder was willful, deliberate, and premeditated and (2) the murder was committed while lying in wait or immediately thereafter."

14

jury's final inquiry seeking clarification on the differences between first and second degree murder, the court wrote: "The elements of, and differences between, first and second degree murder are contained in Calcrims 520 and 521. Based on your question, no further clarification can be provided at this time."

After the court sent the response to the jury, defense counsel asked the court to modify its response to the jury's question about the differences between first and second degree murder. Defense counsel suggested that CALCRIM No. 522 also responded to the jury's inquiry in that CALCRIM No. 522 provides that provocation may affect the degree of murder. Defense counsel requested that the response be amended to inform the jury that CALCRIM Nos. 520, 521, and 522 all provided "guidance on the difference between first and second degree murder." The court denied the request, explaining that CALCRIM No. 522 was "beyond the purview of their question." The judge expressed concern that the suggested response might draw the jury's attention "to an area where I don't know that their original question pondered." The court expressly left open the possibility of reconsidering the issue if the jury requested further clarification.

2. *Standard of Review*

Section 1138 provides, in pertinent part: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

15

Section 1138 "imposes on the trial court a mandatory 'duty to clear up any instructional confusion expressed by the jury'" during deliberations. (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016 (*Lua*).) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) "'When a question shows the jury has focused on a particular issue, or is leaning in a certain direction, the court must not appear to be an advocate, either endorsing or redirecting the jury's inclination.'" (*People v. Montero* (2007) 155 Cal.App.4th 1170, 1180 (*Montero*).) We apply "the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746; *Lua*, *supra*, at p. 1017.)

3. *Analysis*

As the People correctly observe, defense counsel expressly agreed to the court's response to the jury about the distinction between first and second degree murder. In general "[w]hen the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 802; *People*

16

*v. Salazar* (2016) 63 Cal.4th 214, 248; *People v. Debose* (2014) 59 Cal.4th 177, 207.)

Here, counsel initially agreed to the court's response but soon thereafter requested that the court modify its response. We need not decide whether the forfeiture rule applies in these circumstances because we conclude that the trial court did not err.

The trial court did not abuse its discretion by refusing defense counsel's request to inform the jury that CALCRIM No. 522 provided additional guidance concerning the distinction between first and second degree murder. The court answered the jury's question seeking "any clarification" on the differences between the degrees of murder by directing the jury to the instructions that set forth the elements of first and second degree murder. Nieto does not contend that those instructions were incorrect or incomplete statements of the law. Moreover, nothing in the court's answer precluded the jury from considering the evidence of provocation in its continued deliberations.

The jury did not articulate any confusion about provocation as it related to murder or otherwise, or about the distinction between manslaughter and murder. It was reasonable under the circumstances for the court to conclude that directing the jury to the provocation instruction might confuse the jury by unduly emphasizing the role of provocation and possibly directing the jury to consider provocation in the context of voluntary manslaughter. (See *People v. Davis* (1995) 10 Cal.4th 463, 522 [court reasonably declined to instruct further on an issue about which the jury did not express confusion].) The risk of confusing the jury was particularly high because defense counsel never argued that Nieto was guilty of only second degree murder because he was

17

provoked. Rather, counsel argued that Nieto was guilty of only voluntary manslaughter because he was provoked, a topic also addressed by CALCRIM No. 522. By directing the jury to CALCRIM Nos. 520 and 521, the court's answer responded directly to the jury's question by focusing the jury on the different elements necessary to convict Nieto of first degree or second degree murder without improperly "'either endorsing or redirecting the jury's inclination.'" (*Montero*, *supra*, 155 Cal.App.4th at p. 1180.)

Under these circumstances, we conclude that the trial court's response to the jury's question seeking clarification on the degrees of murder adequately addressed the jury's question and was not an abuse of discretion.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____<br>J.

We concur:

RAMIREZ_____
        P. J.

McKINSTER_____
        J.

18